George Albert **GREENWOOD**, on his own behalf and on behalf of certain Underwriters at Lloyd's of London, et al., Plaintiffs,

v.

Jane C. **KOVEN**, Defendant.

Jane C. **KOVEN**, Third–Party Plaintiff

v.

**CHRISTIE, MANSON & WOODS INTERNATIONAL, INC.,** and Barbara Lee Diamonstein, Third–Party Defendants.

No. 92 Civ. 2574 (CSH).

United States District Court, S.D. New York.

March 20, 1995.

---

**188**

William R. Fried, Mendes & Mount, New York City, for plaintiffs.

Robert A. Weiner, McDermott, Will & Emery, New York City, for defendant.

Daniel Shapiro, New York City, for third-party defendant.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the Court on the motion of third-party defendant Christie's for reconsideration of this Court's opinion of December 29, 1993 (the "December Opinion"), denying Christie's motion for summary judgment. While familiarity with that opinion is presumed, the sequence of events leading up to the present motion are sufficiently complicated that it is useful to review them now.

### Statement of Facts

Defendant and third-party plaintiff Jane Koven owned a pastel purportedly created by Georges Braque, a prominent twentieth century French painter (the "Braque pastel" or "pastel"). On May 16, 1990, third-party defendant Christie, Manson & Woods International, Inc. ("Christie's") sold the Braque pastel by auction for $600,000 to co-third-party defendant Barbaralee Diamonstein. Christie's remitted the sale proceeds to Koven. On January 10, 1991, Christie's, purportedly concerned about the authenticity of the pastel and the potential liability those concerns portended, rescinded the sale, returned the purchase price to Diamonstein, and sought return of the $600,000 sale proceeds from Koven.

Koven refused to remit the sale proceeds, believing that Christie's acted improperly in rescinding the sale. Christie's made a claim against its errors and omissions insurers for reimbursement of the funds Koven refused to repay. Plaintiffs, certain underwriters at Lloyd's of London (the "Underwriters"), who insured Christie's and have reimbursed Christie's for the latter's payment to Koven, commenced this action against Koven, as subrogees of Christie's claim against Koven. Koven then initiated a third-party action against Christie's and Diamonstein.

The pastel at issue was purchased by Koven and her husband from A.P. Rosenberg & Co. (the "Rosenberg Gallery"), in 1948 for $1,400. In December of 1989, Koven decided to sell the pastel through Christie's. On December 6, 1989, Koven entered into a written Consignment Agreement with Christie's. The Consignment Agreement was a standard form contract with a number of provisions deleted.

Franck Giraud, the Christie's specialist in charge of impressionist and modern drawings, brought the pastel to Christie's, and an internal inspection process was begun. Christie's followed its standard procedure for reviewing, cataloguing and exhibiting the pastel prior to the May 1990 sale. Because

Christie's guarantees the authenticity of the art it sells, it has developed procedures for assuring itself of the authenticity of that artwork. Pursuant to such procedures, Giraud and Michael Findlay, a senior vice-president in charge of the impressionist and modern painting department, examined the pastel. Both are considered "specialists" on Braque, and after examination, both concluded that the pastel was an authentic Braque work.

The pastel was then examined in a departmental review, where it was physically examined by a number of members of the department. The departmental review supported Giraud and Findlay's initial conclusion, that based on the work's visual qualities and its provenance [1], the authenticity and ownership of the pastel were unquestionable. Christie's thus did not believe it necessary to consult an outside expert opinion.

Christie's promoted the pastel quite extensively, exhibiting it at Christie's showrooms in New York and Paris during the spring of 1990. Diamonstein, a person active in the art and cultural world of New York City, saw the pastel on exhibit in New York. After discussing her interest in the pastel with Giraud, she left instructions with Christie's to bid up to $600,000 for the pastel on her behalf. The auction was held on May 16, 1990, and Diamonstein was the highest bidder.

Christie's claims that Diamonstein raised questions about the pastel's authenticity shortly after the sale.[2] In order to provide Diamonstein with some assurances, Christie's sought documentation of the pastel's provenance from Koven and Elaine Rosenberg, the widow of Alexandre Rosenberg who owned the Rosenberg Gallery. Rosenberg confirmed that the Braque pastel had been purchased from the Rosenberg Gallery. Christie's then wrote several letters to Diamonstein, confirming the pastel's provenance, and assuring her that Christie's had no doubts about the pastel's authenticity. In addition, Christie's informed Diamonstein that Christie's guaranteed the authenticity of everything that it auctioned.

Diamonstein, however, remained unsatisfied, and she demanded that Christie's provide her with written verification of the work's authenticity by a scholar. Christie's does not dispute that it honestly believed the pastel to be authentic; however, given the importance of the work and the clients, Christie's itself contacted an independent expert to have the pastel authenticated as a work by Braque.

That expert was Claude Laurens. Under French law, after the death of an artist, an heir or designee by will is given authority to assert the artist's "moral rights", including the right to authenticate which works are done by the artist. That person is said to hold the *droit moral* for that artist, and Claude Laurens holds the *droit moral* for Braque. Christie's contacted Laurens through his son Quentin, and in November, 1990, Christie's had the pastel flown to France where it could be examined by Quentin Laurens.[3] On January 10, 1991, Quentin Laurens informed Christie's that he did not believe the pastel to be the work of Braque, and that a certificate of authenticity would not be issued.

After receiving this news, Christie's decided to rescind the sale. It refunded the purchase price to Diamonstein, and sought return of the sale proceeds from Koven. Koven, however, refused the request.

---

1. "Provenance" refers to the history of the ownership of a work of art, and is important in determining its authenticity. Because the pastel had been bought from A & P Rosenberg in the 1940's, and always owned by the Kovens, its provenance was considered impeccable.

2. Diamonstein claims such questions were raised prior to sale, but this dispute is irrelevant to Christie's motion.

3. Christie's claims that it thought it appropriate to send the pastel to Quentin rather than Claude Laurens, based on a letter it had received from the President and Director of the Georges Pompidou Museum of Modern Art in response to its inquiry regarding the *droit moral* for Braque. That letter stated, in part: "Claude Laurens has fully assumed this 'moral right', particularly by certifying the authenticity of Georges Braque's works. More recently this authentication has been accomplished (in agreement with his father) by Quentin Laurens, only son of Claude Laurens."

The Underwriters commenced suit against Koven, alleging that she had breached the Consignment Agreement in failing to return the money paid to her once the rescission occurred. Koven filed a third-party complaint alleging that Christie's had breached the Consignment Agreement, as well as its fiduciary duty towards Koven. Specifically, Koven contended that Christie's rescinded the sale despite the fact that the pastel was authentic, and even though Christie's believed it to be authentic. Koven further alleged that Christie's acted improperly in seeking the advice of the Laurens, who are not true experts on Braque; that Christie's favored Diamonstein because of her relationship to certain Christie's executives, to the detriment of Koven, who was Christie's principal; and that Diamonstein raised questions about the authenticity of the pastel only because she was concerned about a falling art market, and was seeking a way to rescind the sale. In her third-party complaint, Koven maintained that Diamonstein was obligated to return the monies Christie's had refunded; she also asked for damages "at least equal to the amount recovered by Christie's underwriters." Second Amended Third–Party Complaint, at 10.

Underwriters, Christie's and Diamonstein all moved for summary judgment. Underwriters argued that Koven breached the Consignment Agreement in refusing to remit the proceeds paid upon Christie's rescission of the sale. Christie's maintained that it acted in accordance with the Consignment Agreement, and breached no duties owed to Koven. Diamonstein claimed that Koven had no claim against her. Koven opposed these motions for summary judgment, arguing that such relief was precluded by the existence of disputed issues of material fact.

### The December Opinion

In its December Opinion, this Court effected a partial, but not complete, resolution of the matters raised by the moving parties.

Finding that Koven had failed to articulate both a clear legal basis and a factual predicate for relief against Diamonstein, the Court granted Diamonstein's motion for summary judgment. That holding is not the subject of the present motion for reconsideration.

Rather, the present dispute surrounds the Court's treatment of the summary judgment motions made by Christie's and the Underwriters.[4] In the December Opinion, the Court denied Christie's and the Underwriters' motions for summary judgment, finding that a dispute as to a legal issue, as well as disputed material facts, precluded such relief.

The legal issue involved whether Christie's breached a duty to Koven by investigating the authenticity of the pastel following the sale. As will be described in greater detail below, Christie's was a party to two contracts covering this transaction: a Consignment Agreement with Koven, delineating the terms of Christie's sale of the pastel on her behalf; and a Limited Warranty agreement with Diamonstein, in which Christie's made certain representations regarding the authenticity of the pastel. Koven argued in her opposition papers that these contracts notwithstanding, Christie's had a duty to Koven as her agent to refrain from activities that would impair Koven's interests, such as investigating Diamonstein's claims that the pastel was unauthentic. Since neither party had briefed this issue of whether such a duty existed, the Court directed the parties to submit letter briefs on this matter within 45 days of the date of the December Opinion.

As to the factual disputes, the Court found that Christie's actions in investigating the authenticity of the pastel were to be measured by a standard of objective reasonableness, and that Koven had raised material factual issues precluding a finding that that standard had been met. Numerous other factual allegations made by Koven were held to be irrelevant to that standard.

---

4. Underwriters stand in Christie's shoes as subrogees of Christie's claim against Koven, and Underwriters' arguments in support of its motion for summary judgment against Koven on its complaint are essentially the same as those advanced by Christie's in support of its motion for summary judgment against Koven on the third-party complaint. For simplicity's sake, the Court will refer to Christie's claims against Koven, and Koven's claims against Christie's, notwithstanding the fact that Christie's claims against Koven are actually Underwriters' claims.

### The Present Dispute

The present dispute has been generated by the submissions made in response to the December Opinion's order that the parties brief the above-mentioned issue (the "supplemental memoranda"). Both Underwriters and Christie's argue that no legal authority can be found for the proposition that Christie's breached a duty owed to Koven when it undertook to investigate Diamonstein's claims of lack of authenticity. Rather, both parties maintain that Christie's actions were governed by the Consignment and Limited Warranty Agreements, and that so viewed, were entirely proper. On their view, this issue should not have precluded summary judgment.

Christie's makes one additional argument in its supplemental memoranda. It argues that the Court also erred in finding that Christie's decision to rescind the sale because of fears of liability was to be judged by an objective reasonableness standard. Rather, argues Christie's, its actions were governed primarily by the Consignment and Limited Warranty Agreements, which, as will be discussed in greater detail below, allowed it to pursue authenticity disputes as it saw fit based on its own judgment. This broad discretion was modified only by an implied obligation to act in good faith, an obligation which it claims it fully satisfied in this case. Therefore, Christie's is not arguing that there are not factual disputes; rather, it maintains that under the appropriate legal standard, these factual disputes are immaterial, and thus do not preclude summary judgment on its behalf.

■ Koven argues that Christie's did breach a duty to Koven when it undertook to investigate the authenticity of the pastel. In addition, she maintains that Christie's exceeded the scope of the Court's directive to brief one narrow issue by rearguing the denial of its summary judgment motion, particularly by contending that the Court erred in applying an objective reasonableness standard to Christie's conduct. According to Koven, if Christie's sought to make a motion for reconsideration, it was required under Southern District of New York Local Rule 3(j) to make such motion within ten days of the docketing of the December Opinion. Because the request for reargument was made by letter far beyond 10 days after the December Opinion, argues Koven, Christie's motion is untimely, and should not be considered on the merits.

As a preliminary matter, therefore, I must decide whether to consider Christie's motion for reargument on the merits. I find that it is proper to do so, for a number of reasons.

■ First, though the Court did direct the parties to brief a narrow issue of law, a party is entitled in its responsive submission to request consideration of related issues. That policy facilitates full consideration of the merits in a case involving important principles.

In any event, Koven can show no prejudice from this Court's consideration of Christie's motion for reconsideration on the merits. While Christie's arguments in its supplemental memoranda are certainly more heated than in its original summary judgment papers, they do not raise any substantive points which were not raised in their original summary judgment motion papers. Therefore, Koven was accorded a full opportunity to respond to the arguments forming the basis of the motion for reconsideration in its opposition to the summary judgment motions.

In addition, Koven was afforded an opportunity to respond further to these arguments in the supplemental memoranda she submitted to the Court, although she chose instead to stress that Christie's attempt to reargue the denial of the summary judgment motion was improper and untimely.

Finally, I find it proper to address the substance of the motion for reconsideration because I believe that motion to be meritorious. For the reasons set forth below, I am persuaded that both Christie's and the Underwriters are entitled to summary judgment, and that the Court's own statement of the law in its December Opinion was in some respects not entirely accurate. A failure to consider the motion to reconsider on the merits would be inefficient and wasteful. If this case went to trial, as it would were I not to consider this motion, Christie's and the Underwriters could move for a directed ver-

dict, arguing that under the proper legal standards, Koven had presented no facts which might entitle her to judgment, nor did there appear a probability that further discovery would yield such facts. Based on what I now find to be the appropriate legal standards, I would be inclined to grant that motion. The effect of not considering this motion on its merits, therefore, would be to make the parties engage in a lengthy and costly trial when the proper disposition of the case is now readily apparent. I decline to take that wasteful step.

Turning to the merits of Christie's motion, there are two issues to consider: (1) Did Christie's breach a fiduciary duty owed to Koven simply by undertaking an investigation of Diamonstein's complaints about authenticity? and (2) Did Christie's actions in response to Diamonstein's complaints, and its subsequent rescission of the sale, violate Christie's obligations to Koven under the Consignment Agreement?

While both of these issues turn on the propriety of Christie's actions in investigating Diamonstein's complaints and rescinding the sale, Koven relies on two different legal theories to vindicate her claim. The first theory is that in taking action to investigate Diamonstein's complaints, Christie's breached a duty of undivided loyalty to Koven, since the decision to conduct that investigation ultimately led to the discovery of information that prompted Christie's to rescind the sale. This theory, then, does not depend on the merits of the actual actions that were taken, but on the fact that Christie's chose to engage in investigative activities at all.

The second theory is based on breach of contract. Under this theory, Koven maintains that the Consignment Agreement itself held Christie's to a particular standard of care in investigating the complaints about authenticity and in deciding to rescind the sale, and that there are material facts in dispute as to whether this standard was met. I will examine each of these theories in turn.

*1. Did Christie's Breach a Duty of Undivided Loyalty Owed to Koven When It Investigated Diamonstein's Claims of Lack of Authenticity?*

▪ Christie's relies on the language of the Consignment and Limited Warranty Agreement as a justification for its investigation into Diamonstein's complaints. The Consignment Agreement provides, in pertinent part:

1. *CONSIGNMENT:* Seller hereby consigns to Christie's the property ... which Christie's, as the Seller's agent, will offer for sale at public auction ... subject to the provisions set forth below and Christie's standard CONDITIONS OF SALE and LIMITED WARRANTY ...

9. *DISCRETIONARY MATTERS:* Christie's shall have complete discretion as to seeking the views of any experts ... Christie's makes no representations or warranties to Seller with respect to the Property, its authenticity, condition or otherwise.

15. *RESCISSION OF SALE:* Christie's, as Seller's agent, is authorized to accept the return and rescind the sale of any property at any time if Christie's in its sole judgment determines that the offering for sale of any Property has subjected or may subject Christie's and/or Seller to any liability, including liability under warranty of authenticity or title. In such event, Christie's is further authorized to refund or credit to the buyer the purchase price of such returned property. If Christie's has already remitted to Seller any proceeds of the rescinded sale, Seller forthwith shall pay Christie's upon request an amount equal to the remitted proceeds.

The Limited Warranty referred to in Paragraph 1 provides, in pertinent part:

These Conditions of Sale, and the Limited Warranty and Absence of Other Warranties ... constitute the complete and exclusive statement of the terms and conditions on which all such property is offered for sale.

Christie's warrants for a period of six years from the date of sale that any article ... which is unqualifiedly stated to be the work of a named author or authorship, is authentic and not counterfeit ...

The buyer's sole remedy under this warranty shall be the rescission of the sale and refund of the original purchase price paid for the article.

As was described in the December Opinion, Christie's made four arguments in support of its motion for summary judgment:

1. The Consignment Agreement was specifically conditioned on the terms of the Limited Warranty. Thus, Christie's obligations to Koven were subject to its obligations to Diamonstein. Accordingly, Christie's actions with regard to investigating authenticity and rescinding the sale must be judged in the context of its obligations under these two agreements.

2. Christie's was bound by its obligations under the Limited Warranty agreement to investigate Diamonstein's questions of authenticity. This affirmative duty to provide reassurances did not interfere with any duty owed to Koven since these actions were taken to protect the sale.

3. Christie's had complete discretion under Paragraph 9 of the Consignment Agreement to seek the views of any individuals it regarded as experts in investigating the pastel's authenticity. Thus, Christie's actions in consulting the Laurens were proper and not subject to challenge by Koven.

4. When the Laurens refused to confirm that the pastel was an authentic work by Braque, Christie's determined that it might be subject to liability under the Limited Warranty. Paragraph 15 of the Consignment Agreement provides that that decision is solely within Christie's discretion. Accordingly, the rescission of the contract was proper.

Koven did not argue that these agreements did not govern Christie's obligations to herself and Diamonstein. She did argue, however, that as her agent, Christie's owed her a duty of undivided loyalty. Given this duty of loyalty, Christie's was forbidden from engaging in any actions that might impair Koven's interests. Therefore, if Christie's was not obligated to investigate Diamonstein's complaints about authenticity, its voluntary decision to do so, ultimately leading to the rescission of the sale, may have violated its duty of loyalty to Koven.

In its December Opinion, the Court framed the issue as follows:

I think the legal question posed is this: Did Christie's breach any duty owed to Koven, grounded either in contract or in tort, when it took affirmative actions to confirm the authenticity of the pastel? If the Limited Warranty did not oblige Christie's to take affirmative action to authenticate the pastel, but instead required Diamonstein to investigate any doubts she may have had, then Christie's actions in that respect may have violated its duty to Koven under the Consignment Agreement and basic agency principles, unless Christie's actions were undertaken to further Koven's interests.

It is clear to me that this presents an issue of law rather than one of fact.... If Christie's was obliged by the terms of the limited warranty to provide assurances to the buyer, then it did not breach any duty owed Koven since its obligations to Koven were defined by the Consignment Agreement, which explicitly incorporates the Limited Warranty. On the other hand, if the Limited Warranty required Diamonstein to follow up on her doubts about the work's authenticity, then conceivably Christie's actions may constitute a violation of its duty of undivided loyalty to Koven, unless Christie's can show that it somehow furthered Koven's interests.

The Court thus directed the parties to brief the issue. It also cited one case, *Dawson v. G. Malina, Inc.*, 463 F.Supp. 461, 467 (S.D.N.Y.1978), which the Court thought might be relevant. That case involved a buyer of a number of pieces of Asian art who sued the dealer for breach of warranty of authenticity. The court in that case held that plaintiff-buyer bore the burden of showing that the artwork was not authentic.

After reviewing the parties' submissions, and after doing additional research on its own, the Court now concludes that Christie's did not breach any duty to Koven when it undertook to investigate Diamonstein's complaints about authenticity. As will be apparent below, the Court's analysis differs some-

what from that proposed in the December Opinion. The December Opinion suggested that might be the case; though the parties' supplemental memoranda reflected a belief that this particular part of the December Opinion was a definitive holding, the Court made it clear that it was attempting to present the pertinent issues to the parties, not that it had made a final judgment.

There is surprisingly little case law on point, but certain general principles of law point to a proper resolution. To begin with, it is indisputable that Christie's acted in the capacity of an agent on behalf of Koven. *See, e.g., Cristallina S.A. v. Christie, Manson & Woods,* 117 A.D.2d 284, 502 N.Y.S.2d 165, 171 (1 Dept.1986). It is also clear that an agent such as Christie's is required under the law to act in a fiduciary capacity on behalf of its principal. *Id.;* Restatement (Second) of Agency, § 13 (1958) ("The Restatement") ("An agent is a fiduciary with respect to matters within the scope of his agency"). Koven correctly points out that among the fiduciary duties owed a principal by its agent is the duty of undivided loyalty. *United States v. Miller,* 997 F.2d 1010 (2d Cir.1993). It is this duty of undivided loyalty that Koven claims was breached when Christie's undertook actions that had the potential to impair her interests.

The duty of undivided loyalty, however, is not the only pertinent principle. Equally relevant is the principle that the terms of an agency relationship may be modified by contract. Section 387 of the Restatement reads:

§ 387. *General Principle*

**Unless otherwise agreed,** an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency. (emphasis added)

The "unless otherwise agreed" language appears throughout the Restatement, and is clearly meant to allow parties to modify by contract the common law agency principles that would govern their relationship in the absence of an agreement. Thus, the general duty of undivided loyalty binds an agent only to the extent its duties are not defined by an agreement.

Section 387 is the Restatement's general view of the duty of loyalty, and the fact that it may be modified by agreement. Section 391 of the Restatement affirms this principle in the narrower context presented here. That section reads:

§ 391. *Acting for Adverse Party without Principal's Consent*

**Unless otherwise agreed,** an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge. (emphasis added).

This section addresses the present case. In relation to Koven, Diamonstein was clearly an adverse party: While Koven sought as high a sale price as possible, Diamonstein sought as low a sale price as possible; while Koven desired that the sale be final, Diamonstein sought to rescind. Christie's was Koven's agent, but it also acted on behalf of Diamonstein, both in giving her certain warranties prior to sale, and in investigating her complaints about authenticity. The Restatement, then, clearly contemplated that an agent might enter into transactions such as these, giving it dual loyalties, and it made such behavior permissible if agreed to by the parties.

Once it is recognized that Christie's fiduciary responsibilities may be modified by agreement, the question becomes whether or not the Consignment Agreement modified Christie's duty of undivided loyalty in such a way that Christie's investigative actions in response to Diamonstein's complaints were permissible. This is a question of contract interpretation. Christie's fiduciary duties are only modified to the extent that the parties agreed that they be so; any duties not modified or addressed by the Consignment Agreement are subject to the common law principles of agency law.

From this perspective, the crucial inquiry is whether or not the agreement between Koven and Christie's included the understanding that Christie's was permitted to investigate complaints about authenticity made by a disgruntled buyer. In addition, from this perspective it is also clear that two of the analytical directions suggested by the December Opinion, and endorsed by Koven in

her supplemental memoranda, are of little value to a proper analysis.

The first of these suggested directions was that the propriety of Christie's actions could be determined by examining who, as between Christie's and Diamonstein, bore the burden of proving and/or investigating authenticity or lack thereof. If Diamonstein was obligated under the Limited Warranty to prove lack of authenticity, and Christie's bore no responsibility for investigating Diamonstein's complaints, then, it was argued, Christie's acted disloyally by voluntarily engaging in a course of action that impaired Koven's interests.

■ The proper question, however, is not whether Christie's was obligated to Diamonstein to investigate her complaints, but whether Christie's potential investigation of such claims was agreed to by Koven in the Consignment Agreement. In the absence of an agreement, an agent's voluntary undertaking of a non-obligatory course of action on behalf of a third-party might conceivably be an act of disloyalty. When, however, there is an agreement that such action can be taken, such action does not breach a duty to the principal, even if "disloyal" in the sense that it is contrary to the principal's interests.[5]

■ This principle also suggests why a second analytical direction suggested by the December Opinion is not pertinent. Christie's argued that its investigatory actions were not disloyal, since Christie's acted under the belief that the pastel was authentic, and that further investigation would confirm this, furthering Koven's interests. Koven alleges that Christie's motive was to benefit Diamonstein, rather than Koven. Whether Christie's action was taken to further the interest of Koven, however, is irrelevant to this particular issue[6] because the Consignment Agreement explicitly allowed Christie's to act against the interest of Koven by providing Christie's authority to rescind the sale. If Christie's and Koven agreed that Christie's would act in the interest of Diamonstein under certain circumstances, there is nothing improper about Christie's acting in the agreed-to way, even if such actions were adverse to Koven. It is only if Christie's acted in a way that was not agreed to that the propriety of its actions becomes relevant, for then its duty of loyalty is defined by common law agency principles rather than by the agreement.

Finally, this principle also explains why the *Cristallina* case, relied on heavily by Koven, does not help her case. *Cristallina* did hold that an auction house acts as an agent for its consignor, and owes it a duty of undivided loyalty as its fiduciary. *Cristallina*, 117 A.D.2d 284, 502 N.Y.S.2d 165, 171. It did not hold, however, that such duties may not be modified by contract. *Cristallina* dealt with whether or not an auction house could be liable to a consignor for alleged pre-sale misstatements to both the consignor and the public about the value of the items to be auctioned. The conduct of which the consignor was complaining was of a sort not authorized by any agreement between the parties, and the auction house did not defend upon that basis. Thus, *Cristallina* is relevant, if at all, only if it is first found that Christie's actions were not authorized by the Consignment Agreement.

■ Turning now to the agreement between Koven and Christie's, the Court has no doubt that the Consignment Agreement manifested an understanding that Christie's was permitted to engage in the type of investiga-

---

5. This also makes it clear why the *Dawson* case, brought to the parties attention in the December Opinion and endorsed by Koven, is irrelevant (as the Court suggested it might be). The *Dawson* case held that in a suit by a buyer against an auction house claiming that a purchased item was not authentic, the buyer bears the burden of proving lack of authenticity. Koven suggests that the logical implication of this holding is that since Christie's would not have the burden of proving anything in a suit by Koven, it therefore was not obligated to gather evidence that might prove authenticity. Even if that highly questionable proposition were true, it provides Koven a grounds for relief only if Christie's actions are judged on the basis of whether they satisfied the duty of undivided loyalty. As the text makes clear, however, Christie's actions, even if disloyal, may have been entirely proper if agreed to by Koven.

6. It is relevant, however, to the issue of whether Christie's acted in good faith, which will be discussed below.

tory actions undertaken here. A careful examination of that agreement makes this clear.

First, the Consignment Agreement, in Paragraph 1, made Christie's obligations to Koven explicitly subject to the Conditions of Sale and Limited Warranty that govern the relationship between Diamonstein and Christie's. The Limited Warranty made it clear that Christie's was guaranteeing the authenticity of the pastel to Diamonstein, and indeed, New York statutory law evinces a strong public policy in favor of construing auction-buyer agreements to include such warranties, and of narrowly defining the permissibility and scope of disclaimers of such warranties. *See N.Y. Arts and Cultural Affairs Law*, § 13.01. Thus, Koven knew or should have known from both the contract and New York law that Christie's loyalty to her was subject to a conflicting loyalty to the buyer.

Even recognizing this duty to the buyer, however, Koven could argue that her understanding that Christie's was warranting the authenticity of the pastel to Diamonstein did not mean that she was agreeing that Christie's could voluntarily engage in actions which might "assist" Diamonstein in vindicating her rights under the warranty. Such an argument, however, is without merit.

It is certainly true that the Consignment Agreement does not include language explicitly authorizing Christie's to investigate complaints about authenticity made by a buyer following a sale. Paragraph 9, however, gives Christie's discretion in "seeking the views of any expert", which clearly presupposes that such experts will in fact be contacted.

■ Koven argues that Paragraph 9 was not meant to apply post-sale, or at least, that it is ambiguous and should be construed against Christie's, the provision's drafter. While it is true that ambiguous agreements are to be construed against the drafter, it is also true that this rule of construction is to be applied as a last resort, only when the parties' intentions cannot be gleaned from the agreement. *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir.1989). In the present case, the Court finds the Consignment Agreement to be unambiguous, and the parties' intentions clearly discernible.

The provision granting Christie's discretion to seek the views of experts does not by its terms limit itself to the pre-sale environment, and Koven has offered no persuasive reason for reading into the contract such a limitation. *See, e.g., Broadway Nat. Bank v. Progressive Cas. Ins. Co.*, 775 F.Supp. 123, 126 (S.D.N.Y.1991), *affirmed*, 963 F.2d 1522 (2d Cir.1992) ("Court should not find language of contract ambiguous on basis of interpretation urged by one party, where that interpretation would strain contract language beyond its reasonable and ordinary meaning.") Her only argument is that the clause is contained within a paragraph limiting itself to pre-sale matters.

As an initial matter, the Court does not find that the other clauses in Paragraph 9 can so easily be classified as dealing solely with pre-sale matters. In addition, a review of the entire Consignment Agreement reveals no apparent structure or intent with regard to separating out pre-sale and post-sale matters. Some paragraphs deal with pre-sale matters, some with post-sale matters, and still others deal with both or cannot be classified by such a bright line distinction. The structure of the Consignment Agreement, then, does not counsel reading into Paragraph 9 a restriction upon post-sale inquiries of experts.

Nor does a reasonable interpretation of the Consignment Agreement suggest such a reading. Koven suggests that this provision could possibly be read to apply pre-sale only, but offers no interpretation of the Consignment Agreement under which such a restriction would somehow effectuate the intent of the parties. Paragraph 15 gives Christie's the authority to rescind a sale if it "in its sole judgment determines" that it may be subject to liability under the warranty of authenticity. Thus, Koven agreed that Christie's would need to make a post-sale determination regarding authenticity and liability in some circumstances, and the authority to seek out the views of experts follows neces-

sarily in order to facilitate the making of such a determination.

Finally, if, as Koven alleges, her interests in consummating a final sale of her product are furthered by Christie's taking no action to uncover potentially unfavorable information, that interest is similarly implicated by pre-sale inquiries, which are equally capable of rendering Koven's pastel unsalable. Thus, the Court does not perceive any reasonable explanation as to why, given the entire Consignment Agreement, Koven would have bargained for this particular limitation, other than that on the particular facts of this case, it appears to Koven in hindsight that such a restriction would have been beneficial to her.[7]

Conversely, it is quite clear that Christie's would have bargained for the authority to consult experts post-sale, given its warranties to the buyer, and the prospect that rescission of the contract might be necessary. *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990) ("Under New York law, in determining motion for summary judgment involving construction of contractual language, court should accord that language its plain meaning giving due consideration to surrounding circumstances and apparent purpose which parties sought to accomplish.")

Though the Court finds that the specific language of Paragraph 9 plainly and unambiguously authorized Christie's to contact experts post-sale, it also finds that such authority is implicit in other aspects of the Consignment Agreement. *See, e.g., Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.,* 807 F.Supp. 337, 347 (S.D.N.Y.1992) ("Under New York law, terms of contract may be found in writings either expressly or by reasonable implication.") As noted above, Paragraph 15 of the Consignment Agreement authorizes Christie's to rescind the sale of any property if Christie's "in its sole judgment determines" that the sale has subjected or

"may subject" Christie's to liability under the warranty of authenticity.[8] Thus, Koven clearly agreed that Christie's had the right to rescind sales based on its "sole judgment", a right that obviously conflicted with Koven's interest in the finality of the sale. In order to prevail, then, Koven now must argue that while she agreed that Christie's could in its "sole judgment" "determine" whether or not to rescind the sale, she did not agree that Christie's could gather information to aid it in determining how to exercise this judgment.

There is no merit to such an argument. Koven has argued, and Christie's now apparently concedes, that Christie's exercise of its discretion under Paragraph 15 was subject to an implied covenant of good faith and fair dealing. Given this requirement, it is clear that Christie's could only satisfy its good faith obligation by honestly attempting to make an informed decision. Had Christie's not consulted experts and instead flipped a coin in deciding whether or not to rescind the sale, Koven would argue, correctly, that Christie's had acted in bad faith. To now argue, then, that Christie's violated some other duty by investigating Diamonstein's complaints eviscerates Christie's plainly recognized right to determine, in some circumstances, when a sale should be rescinded. *See, e.g., Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985) ("[I]nterpretation that gives reasonable and effective meaning to all terms of contract is generally preferred to one that leaves part unreasonable or of no effect.") Koven's argument places Christie's in a "damned if you do, damned if you don't" position which flies in the face of any remotely reasonable interpretation of the Consignment Agreement.

For all of the above reasons, I find that Christie's breached no duty to Koven when it undertook to investigate Diamonstein's complaints about authenticity. Such actions were entirely proper and authorized by the Consignment Agreement, notwithstanding

---

**7.** Indeed, during her deposition, Koven was asked if she had been made aware by Christie's beforehand that the pastel would be taken to Claude Laurens for inspection. Koven admitted that she had been made aware, and further, that she had not objected at the time.

**8.** The Court notes and reaffirms its finding in the December Opinion that Christie's right to rescind when it "may" be subject to liability allowed Christie's to rescind even in the absence of a lawsuit, and even in the absence of a belief that the pastel was not authentic.

that they might not have furthered Koven's interest.[9] Thus, while the December Opinion held that the potential existence of this duty precluded the relief sought by Christie's and Underwriters, I now hold that this issue does not preclude summary judgment on behalf of those parties. *See, e.g., Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 148 (2d Cir.1993) ("Where contract language is plain and unambiguous, court may construe contract and grant summary judgment.")

### 2. Did Christie's Investigatory Actions and Subsequent Rescission Breach its Duty of Care to Koven Under the Consignment Agreement?

■ The other issue to be resolved is the proper standard of care to be exercised by Christie's in determining whether or not to rescind the sale, and whether or not Christie's has shown that it is entitled to summary judgment on the issue of whether that standard was met. The starting point in resolving this issue is once again the December Opinion.

Christie's argued in its summary judgment papers that the Consignment Agreement gave it complete discretion to decide when to rescind a sale. Koven argued, however, that Christie's was bound by an implied covenant of good faith, which meant that everything about its decision to rescind the sale must have been objectively reasonable. The Court agreed with Koven that this was the appropriate standard, and it further found that based on this standard, several material facts were in dispute precluding the granting of summary judgment on behalf of Christie's and Underwriters.[10]

After reviewing the parties' submissions and reconsidering its opinion, the Court now finds that the standard of care articulated in the December Opinion is not entirely correct. It is correct that the Consignment Agreement, like all contracts governed by New York law, was subject to an implied covenant of good faith and fair dealing. *See, e.g., Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980). Indeed, Christie's now appears to concede this in its supplemental memoranda. As will be explained below, however, it is not correct that Christie's right to rescind was subject to a standard of objective reasonableness.

### A. The Appropriate Standard

The starting point in determining the proper standard of care is the Consignment Agreement. As discussed above, Paragraph 15 of that agreement explicitly gave Christie's the right to rescind when it had determined in its "sole judgment" that it might be subject to liability as a result of the sale. The question, then, is what standard is to be applied in judging the propriety of Christie's exercise of this judgment.

Though research was unable to uncover any case addressing the specific contractual clause at issue here, the Court finds the body of law dealing with so-called "satisfaction clauses" to be highly analogous here. Such clauses typically condition a party's perfor-

**9.** It should be apparent that this finding obviates the need to address Christie's contention that New York statutory law and public policy considerations obligated Christie's to respond to Diamonstein's complaints about authenticity. The possible existence of such an obligation might be an issue if Christie's were subject to a conflicting duty of loyalty to Diamonstein. Given, however, the Court's finding that Christie's actions were permissible under the Consignment Agreement, the Court need not consider whether such actions were not only permissible, but obligatory.

**10.** Specifically, the factual disputes held to be material to Christie's entitlement to summary judgment were:

Whether the "art world" relies on the holder of the droit moral of an artist for determinations of authenticity.

Whether Claude or Quentin Laurens are trained scholars who are capable of authenticating works of art by Braque.

Whether Claude and Quentin Laurens are the experts generally accepted by the art world regarding questions about the authenticity of works attributed to Braque.

Whether Claude Laurens ever personally examined the Braque pastel.

Whether Claude Laurens is physically and mentally competent to authenticate works of art by Braque.

Whether Christie's was acting reasonably when it made no effort to obtain the expert opinions of experts who are experienced in works of art by Braque.

Whether Christie's was acting reasonably when in its sole judgment it determined to rescind the sale of the pastel.

mance of an obligation on that party's satisfaction with the performance of the obligee, or with something else not within the control of the obligee. E. Allen Farnsworth, *Farnsworth on Contracts*, Vol. II, § 8.4 (1990) (*"Farnsworth"*). Generally speaking, such clauses often require courts to decide whether the parties intended that the party whose performance is conditioned upon its satisfaction be reasonably satisfied (objective standard), or honestly, albeit unreasonably, satisfied (subjective standard). *Id.; Royal Bank of Canada v. Beneficial Finance Leasing Corporation*, 1992 WL 167339 (S.D.N.Y. 1992).

The clause in this case closely resembles a "satisfaction clause". Christie's consummated a sale on behalf of Koven, but its obligation to refrain from rescinding that sale was expressly conditioned upon its satisfaction that the continuing affirmation of the sale would not subject it to liability. If Christie's were not so satisfied, it would be entitled to rescind.

The question of whether dissatisfaction was meant to be reasonable, or simply honest, is a question of law. *Misano di Navigazione SpA v. United States*, 968 F.2d 273, 275 (2d Cir.1992). Though the cases and commentaries caution against the imposition of a subjective standard, they do so only when an ambiguous contractual provision is at issue. *Id.;* Restatement (Second) of Contracts, § 228, comment a (1981). In such cases, the preference is for an objective standard which provides greater protection to the obligee. *Farnsworth*, § 8.4.

In this case, the contractual language is clear that a subjective standard was to apply. Christie's was authorized to "determine" in its "sole judgment" whether or not it might be subject to liability. This language is a clear indication that only Christie's judgment was to be relevant in its determination as to potential liability. *See, e.g., Farnsworth*, § 8.4 ("Words such as 'personal' or 'entire' satisfaction and 'sole judgment' help to show that honest satisfaction was intended.") (emphasis added); *Kaplan v. City of New York*, 10 A.D.2d 319, 200 N.Y.S.2d 261, 264 (App. Div., 1st Dep't 1960) (standard of satisfaction was subjective, where party was to be "sole judge" of whether condition had been satisfied).

## B. The Role of Good Faith

▮ The fact that the subjective standard applies, however, does not in itself entitle Christie's to summary judgment. As noted above, Christie's obligations to Koven were subject to an implied covenant of good faith and fair dealing. While both parties now appear to agree that this covenant applies, they have predictably different views on how it constrained Christie's conduct. It is thus necessary to articulate how the covenant of good faith interacts with the subjective standard of dissatisfaction articulated in the Consignment Agreement.

Koven clearly bargained away an important right when she surrendered to Christie's the authority to rescind based upon Christie's own view of a particular set of facts. There is an obvious danger in such a clause, in that Christie's could conceivably develop a purpose for rescinding that was improper, having nothing to do with its thoughts on liability.

▮ It is thus essential that Christie's not be able to insulate its decision from judicial scrutiny merely by holding up the Consignment Agreement and pointing to its authorization to take this action. The covenant of good faith effectuates this need. *See, e.g., Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir.1994) ("Implied covenant of good faith and fair dealing ... precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.") It mandates that an action authorized to be taken for a particular reason actually be taken for that reason. As Professor Farnsworth wrote, in the context of an owner's agreement to pay a contractor only upon the owner's satisfaction with the work:

> "If the contract is interpreted to require actual satisfaction, the contractor is not entirely at the owner's mercy. The owner cannot avoid liability merely be expressing dissatisfaction; the owner's judgment must be exercised in good faith, and the dissatisfaction may not be solely with the bargain

itself or with the matters of which the owner was aware when the contract was made." *Farnsworth*, § 8.4.

The requirement that Christie's honestly believe it might be subject to litigation prior to rescinding is undoubtedly not the level of protection Koven would like, but it is significant protection in assuring that Christie's not use its broad power with indifference to Koven's interest. If Koven sought greater protection than the minimal protection the law gives parties to a contract, she should have bargained for that in the Consignment Agreement.

The issue, thus, is not, as Koven contends, whether it was reasonable to consult the Laurens, whether Claude or Quentin Laurens is the true expert, or whether a holder of the *droit moral* should have been presumed an expert. Rather, the issue is simply whether Christie's honestly believed it might be subject to liability when it rescinded the sale. Koven's attempt to make the inquiry whether Christie's *should have* held this belief would limit Christie's to rescinding the sale only when it was reasonable to do so. Such a restriction upon Christie's right to rescind was not bargained for, and the requirement of good faith cannot be construed to create such a restriction. *See, e.g., Doubleday & Co., Inc. v. Curtis*, 763 F.2d 495, 500 (2d Cir.1985) (holding, in case where publisher was contractually entitled to reject a manuscript that it found unsatisfactory, that "[a]lthough we hold that publishers must perform honestly, we decline to extend that requirement to include a duty to perform skillfully.")

It should also be noted, because the parties address it, that the applicability of this lower standard of care is not changed by the general principle that a compensated agent with special skills is held to the standard of care of similar agents in that locality. This heightened standard of care is a general principle of agency law, but as was noted above in the discussion of the duty of loyalty, many agency duties may be modified by contract. Section 379 of the Restatement reads:

379. *Duty of Care and Skill*

(1) **Unless otherwise agreed,** a paid agent is subject to a duty to the principal to act with standard care and with the skill which is standard in the locality for the kind of work which he is employed to perform and, in addition, to exercise any special skill that he has. (emphasis added).

In the present case, Christie's and Koven agreed on a lower standard of care; specifically, that Christie's decision to rescind the sale of the pastel would be made by Christie's in its "sole judgment".[11] Given this agreement, the heightened standard of care does not apply.[12]

### C. Has the Standard Been Met?

■ Christie's, then, was only obligated to act in good faith, which in this case meant that it could only rescind the sale if it honestly believed that it might be subject to liability if it refused to do so. Christie's correctly argues that the factual disputes that go to the issue of reasonableness, and which precluded summary judgment in the December Opinion, are not necessarily material under this standard. It therefore remains to be determined whether there are any material disputes of fact regarding whether Christie's honestly believed it might be subject to liability when it rescinded the sale.

It is apparent that good faith in this case is largely a question of motive. That is, was Christie's motivated by an honest belief that it might be subject to liability, or was it motivated by something else? Motive, of course, is often difficult to prove. There is

---

**11.** Christie's, in any event, contends that it has met this higher standard, given that Sotheby's also contacts the Laurens for expert opinion.

**12.** The heightened standard of care does not govern because the parties agreed that a different standard applied. This principle is not in conflict with the finding that the implied covenant of good faith and fair dealing does apply, regardless of whether or not agreed to. This is because the implied covenant of good faith and fair dealing, when it applies, is considered to be a term in the contract between the parties, whether or not it is actually expressed therein. *See, e.g., Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052 (2d Cir.1992): "Under New York law, parties to express contract are bound by implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."

seldom a "smoking gun" revealing an improper motive, and a party seeking to establish such a motive must fall back on inferences reasonably drawn from the circumstances. Given the difficulty of proving such a motive in opposing a motion for summary judgment, a court, particularly on summary judgment, should be careful to recognize that the issue of motive is a question of fact, and that all reasonable factual inferences are to be made on behalf of the party opposing summary judgment. *See, e.g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *G. Golden Associates of Oceanside, Inc. v. Arnold Foods Company, Inc.,* 870 F.Supp. 472 (E.D.N.Y.1994) ("Whether a party has acted in good faith is typically a question to be answered by the trier of fact, not in a summary judgment motion.")

At the same time, however, the device of summary judgment plays a critical role in our civil justice system in allowing parties truly entitled to prevail as a matter of law to obtain such relief without the cost of a burdensome trial. Thus, a court should also be aware that allegations of bad faith are often not difficult to manufacture, and that summary judgment should not be denied simply because the opposing party has suggested but not supported a possible scenario pointing toward bad faith. *See, e.g., Employers Mutual Casualty Company v. Key Pharmaceuticals, Inc.,* 871 F.Supp. 657 (S.D.N.Y. 1994) (noting that "although caution must be exercised, it is clear that summary judgment is an available remedy even when intent is in issue."); *South Beach v. Justin Boot Compa-*

*ny,* 1995 WL 6239 (S.D.N.Y.1995); *National Union Fire Insurance Company of Pittsburgh, PA v. Academy Lines, Inc.,* 1995 WL 5866 (S.D.N.Y.1995).

In support of Christie's protestation of its honest belief that it might be subject to liability are several undisputed facts: that Christie's responded to Diamonstein's initial complaints by confirming authenticity; that Christie's would forfeit its commission if the sale was rescinded; that Diamonstein requested written certification of authenticity post-sale; that Claude Laurens is vested with authority under French law to issue a certificate of authenticity; that Christie's was informed by the Laurens [13] that no certificate of authenticity would be issued because of the belief that the pastel was not the work of Braque; that the value of the pastel decreased as a result of the Laurens' opinion; that Christie's rescinded only after the Laurens refused to confirm authenticity; that Christie's forfeited its commission as a result of its rescission of the sale; and that Christie's undertook to confirm authenticity even after the rescission had occurred. These undisputed facts strongly support Christie's position that its decision to rescind was made in good faith.

In response to this showing, to defeat summary judgment, Koven may not simply rely on the allegations and denials in her pleadings. *Federal Rules of Civil Procedure,* Rule 56(e). Rather, she must set forth specific facts showing that there is a genuine issue for trial. *Id.*[14] Put differently, Koven must

13. The Court recognizes that lumping Claude and Quentin Laurens into the "Laurens" blurs a distinction that Koven believes is quite important. In Koven's view, if anyone was an expert, it was Claude Laurens, not his son. Therefore, the fact that Christie's dealt with Quentin Laurens, without insuring that Claude Laurens had performed the inspection and rendered the opinion, is, according to Koven, evidence of bad faith. The Court disagrees. As the Court has found, Christie's is not required to show that it acted reasonably, only that it honestly believed it might be subject to liability. It is undisputed that Christie's was informed by a reputable source within the French arts community that Quentin Laurens, by agreement with his father, was actively involved in the authentication process. The facts and circumstances surrounding the contacting of the Laurens' and the rendering of

the opinion are such that they clearly support an inference that Christie's honestly believed an important and recognized expert had failed to authenticate the pastel, whether it was Claude or Quentin Laurens. The alleged failure to confirm the precise mechanics of the Laurens' review might have been injudicious, but it cannot, viewed in the context of all of Christie's actions, support an inference of bad faith.

14. Rule 56(e) reads, in relevant part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there

show that viewing the disputed facts in a light most favorable to her, a rational fact-finder could reasonably infer that Christie's acted in bad faith. *See, e.g., James Cronin v. Aetna Life Insurance Company,* 46 F.3d 196, 204 (2d Cir.1995) (holding, in the context of an employment discrimination case:

> "In determining whether the plaintiff has met the de minimis initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.")

Applying this standard, the Court finds that Koven has failed to make the showing necessary to defeat summary judgment.

In the face of Christie's undisputed evidence, highly suggestive of an honest determination on Christie's part that it might be subject to liability, Koven asks the Court to find that a rational fact-finder could reasonably conclude that Christie's consultation with and reliance upon the Laurens was so utterly preposterous that an inference can be drawn that Christie's was engaged in an artifice, seeking to dredge up a superficially plausible justification for rescission that would mask their true motive of catering to Diamonstein. This argument has no merit.

There is simply no evidence that Christie's decision to rescind was motivated by a desire to help Diamonstein, rather than an honest belief that it might be subject to liability. The various arguments put forward by Koven in support of such a motive are unavailing.

Koven's argument begins something like this: Diamonstein was a personal friend of certain top-level Christie's executives. After purchasing the pastel, the art market began to decline, and Diamonstein wanted to rescind the sale. Christie's wished to accommodate her, since she was a favored customer, and this favoritism can be evidenced by a

statement a Christie's employee made in a letter, indicating that Christie's wished to resolve the matter quickly because Diamonstein was a "very important client to us." Thus, Christie's was looking for a way to help Diamonstein unwind an unfavorable transaction.

In furtherance of its scheme to get out of the sale, Christie's then contacted the Laurens, individuals who were completely unqualified to render an opinion on authenticity. When these individuals refused to confirm authenticity, Christie's, despite its own belief that the pastel was authentic, used that excuse to do what it had wanted to do all along: rescind the sale to assist Diamonstein.

This story is simply unbelievable, and could not be accepted by any rational fact-finder based on the available evidence. There are numerous aspects of it which are implausible. First, the credibility of such a story depends upon the finding that Christie's engaged in elaborate attempts to investigate authenticity hoping to produce an opinion from some reputable individual denying authenticity and providing a pretense for rescission. If that were truly the motive, Christie's would have responded to Diamonstein's initial complaints either by rescinding, or by contacting the Laurens immediately. They would not have waited to see if Diamonstein would continue to complain before taking the step that would provide the grounds for rescission. They also would not have attempted to get the Laurens to reverse their decision once the sale had been rescinded.

In addition, it has not been contended by anyone that the Laurens were allied with Christie's in any way, or participants in a scheme to deny the authenticity of the pastel. Thus, it is inexplicable to the Court how such a purported scheme would be furthered by Christie's sending the pastel to an individual whose opinion it could not predict. Indeed, Koven has argued strenuously that Christie's has always believed the pastel to be authentic; it is hard to believe, then, that Christie's expected that sending out the pastel for fur-

is a genuine issue for trial. If the adverse party does not so respond, summary judgment,

if appropriate, shall be entered against the adverse party."

ther examination would somehow dredge up an opinion denying authenticity.

In addition to the inherent implausibility of Koven's story, many of the specific allegations she relies upon simply could not support a reasonable inference of bad faith. Koven contends, for example, that Christie's was motivated by a desire to avoid litigation, not by a belief that the pastel was not authentic. As the Court's December Opinion made clear, however, the Consignment Agreement explicitly permitted Christie's to rescind so as to avoid litigation. Of course, Christie's could not rescind solely out of a general aversion to lawsuits if it did not honestly believe it might be subject to liability in the ensuing litigation. But a desire to avoid litigation is entirely consistent with a motive to avoid potential liability, and cannot possibly support an inference of bad faith.

Koven also contends repeatedly that Christie's continued belief in the authenticity of the pastel is also evidence that its decision was made in bad faith. Again, though, the December Opinion explicitly held that Christie's was entitled to rescind even if it believed the pastel was authentic. A good faith belief that the pastel is authentic is entirely consistent with a belief that Christie's might nonetheless be subject to liability. Indeed, the undisputed fact that the Laurens refused to issue a certificate of authenticity was ample reason for Christie's to think that whether or not the pastel was actually authentic, Christie's might have trouble prevailing in its case. Koven agreed that Christie's could rescind even though it held a good faith belief in the pastel's authenticity; therefore, the allegation that Christie's rescinded while holding such a belief cannot possibly support an inference of a dishonest motive on the part of Christie's.

In short, I find that the facts, viewed in a light most favorable to Koven, could not lead a rational fact-finder to infer that Christie's did not honestly believe it might be subject to liability when it rescinded the sale. Therefore, Christie's did not as a matter of law breach the implied duty of good faith and fair dealing under the Consignment Agreement, and is entitled to summary judgment on this issue.

The two issues that had precluded summary judgment in the December Opinion have now been reconsidered and resolved in favor of Christie's and Underwriters. Therefore, the Court finds the following: Underwriters are entitled to summary judgment against Koven for her breach of the Consignment Agreement, in refusing to remit the proceeds paid upon Christie's rescission of the sale. Christie's is entitled to summary judgment on Koven's Third–Party Complaint, since it breached no duty to her either under agency law or contract law.

\*    \*    \*    \*    \*    \*

In closing, I think it appropriate to say something about the import of this opinion, given that counsel for Christie's and Koven have each presented a parade of horribles likely to result from a decision adverse to their clients. Koven's attorney, in particular, has stated that this opinion will have tremendous implications for the glamorous world of art collection and dealing, that it will be an important statement about the complex relationship between buyers, sellers, and auction houses, and that it will determine the proper role to be played by different types of experts in arbitrating the authenticity battles of art world titans.

These predictions notwithstanding, it should be apparent that this decision is mostly about the relatively unglamorous world of contract law. The Consignment Agreement in this case clearly addressed the dispute between the parties. Though Koven is understandably dissatisfied with the rescission of the sale, Koven read and understood the Consignment Agreement and is bound by its terms.

The Court recognizes that there are certain things which parties may not agree to in a contract because they are so antithetical to the public interest that the law will not enforce them. Indeed, as noted above, the New York Legislature has decided that auction houses may not under certain circumstances contractually disclaim warranties of authenticity for the items they sell. Though Koven seems to think the contractual provisions at issue here to be similarly unjust, that is far from the case. Christie's contractual

arrangements between its buyers and its sellers appear to be a sensible resolution of a complex commercial problem, recognizing important duties to different parties. The buyer of artwork is protected by a warranty; the seller is protected not only by the covenant of good faith, but by the fact that an auction house earns its money by consummating final sales of artwork. Thus, the broad discretion to rescind afforded Christie's by the Consignment Agreement is tempered by the fact that Christie's own interest is that such rescission not occur.

The Court's view of the structure of this business is, of course, offered only as its own reflection on the matter. The important point is that while Koven asks the Court to make bold determinations about how the auction market should work, and how expert determinations about authenticity should properly be made, it is not the Court's role to impose upon an industry its own view of how common transactions should be structured. As the New York Court of Appeals recently wrote, in refusing to impose upon a finder additional duties not specified in the finder's agreement with its client,

> "This Court should not attempt to elevate all the mores of society to the standard of the 'punctilio of an honor the most sensitive' . . . where that is not justified, agreed to or expected. This Court, after all, is not the omniscient, great equalizer of the marketplace, with all its ups and downs, give and take, and varieties of conduct and relationships." *Northeast General Corp. v. Wellington Advertising*, 82 N.Y.S.2d 158, 165, 604 N.Y.S.2d 1, 5 [624 N.E.2d 129, 133] (1993).

The Court agrees wholeheartedly with this sentiment. In the absence of a legally recognizable justification for ignoring the clear terms of the Consignment Agreement, Koven is bound by that instrument, however unfair she thinks the final result.

The December Opinion is accordingly modified by the findings herein, and Christie's and Underwriters' motions for summary judgment are granted, except that the Court reaffirms that portion of the December Opinion that denied Christie's motion for summary judgment seeking indemnification by Koven for its litigation expenses.

The Clerk of the Court is directed to enter summary judgment in favor of plaintiffs against defendant on the complaint, and in favor of third-party defendant Christie, Manson & Woods International, Inc. dismissing the third-party complaint with prejudice.

SO ORDERED.