**John T. MICKLE, Plaintiff,**

v.

**CHRISTIE'S, INC., Defendant.**

**Christie's, Inc., Counterclaim Plaintiff,**

v.

**John T. Mickle and Diana J. Mickle, Counterclaim Defendants.**

**Diana J. Mickle, Third–Party Defendant and Third–Party Counterclaim Plaintiff,**

v.

**Christie's, Inc., Third–Party Plaintiff and Counterclaim Defendant.**

**No. 01 CIV. 3979(VM).**

United States District Court, S.D. New York.

June 25, 2002.

---

Mark J. Lawless, Sokolow, Dunaud, Mercadier & Carreras, L.L.P., New York, NY, for John T. Mickle.

Michael E. Salzman, Hughes, Hubbard & Reed, L.L.P., New York, NY, for Christie's, Inc.

MARRERO, District Judge.

Plaintiff John T. Mickle ("Mickle") brought this action alleging that defendant Christie's, Inc. ("Christie's") committed breach of contract, of fiduciary duties and of implied duties of good faith and fair dealing, all in connection with Christie's cancellation and rescission of the sale of a work of art owned by Mickle and his sister, Diana J. Mickle (collectively, the "Mickles"), and consigned to Christie's for auction. Christie's, asserting that it rescinded the sale after questions arose concerning the authenticity of the painting, responded with counterclaims for fraud, misrepresentation and declaratory relief, as well as with a motion requesting summary judgment dismissing the complaint. For the reasons discussed below, Christie's motion is GRANTED.

### FACTS[1]

In early 1999, the Mickles, who assert that they have no formal training in art, consigned to Christie's for auction a painting they represented they co-owned, having inherited it from their grandmother. The painting, known as "Billy Bowlegs" ("the Painting"), is an unsigned work, which the Mickles attributed to the noted 19th century American painter, Carl Wimar ("Wimar"). Christie's, in order to verify that the Painting was by Wimar prior to entering into an auction agreement with the Mickles, contacted by telephone Joseph D. Ketner ("Ketner"), co-

author of a 1991 book on Wimar, entitled *Carl Wimar, Chronicler of the Missouri River Frontier*, that lists the Painting among Wimar's works. Christie's asserts that on that occasion Ketner confirmed his attribution of the Painting to Wimar.[2] Based on information provided by the Mickles, Ketner's opinion and the assessments of its own staff, Christie's concluded that the Painting was properly attributed to Wimar.

On February 16, 1999, the Mickles entered into a Consignment Agreement with Christie's for the auction sale of the Painting. (Affidavit of Paul R. Provost, sworn to on February 19, 2002 ("Provost Aff."), Ex. C.) Two provisions of that agreement are central to the dispute at hand. Paragraph 8(b) states:

> Non–Payment by Buyer. Christie's shall have no obligation to enforce payment by the buyer. However, in the event of non-payment by the buyer, Christie's in our sole discretion, as Consignor's agent or on our own behalf, may cancel the sale and return the Property to Consignor, enforce payment by the buyer or take any other actions permitted by law. Christie's shall not, under any circumstances, be liable for any consequential damages to Consignor as a result of non-payment of the buyer.

Paragraph 8(c) provides:

> Rescission of Sale. Christie's, as Consignor's agent, is authorized to accept the return and rescind the sale of any lot of Property at any time if Christie's in our sole judgment determines that the offering for sale of any Property has

---

1. The factual recitation herein derives primarily from the parties' statement of material facts submitted pursuant to Local Civil Rule 56.1. *See* Statement of Defendant Christie's Inc. Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Statement"); The Parties J.T. Mickle and

Diana J. Mickle's Statement Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1 Statement").

2. The Mickles assert that in various statements to third parties between November 1982 and May 1991, Ketner reaffirmed this attribution of the Painting to Wimar.

subjected or may subject Christie's and/or Consignor to any liability. . . .

Prior to an auction scheduled for May 26, 1999, Christie's exhibited the Painting in its galleries and listed the work in its catalogue in a lot entitled "Important American Paintings, Drawings and Sculpture" ("the Catalogue"). (Provost Aff., Ex. D.) The Catalogue attributed the work to Carl Wimar. (*Id.*) The Catalogue also contained a section entitled "Conditions of Sale and Limited Warranty" to which the artwork's consignment and auction sale, pursuant to Paragraph 1 of the Consignment Agreement, were subject. (Provost Aff., Ex. D.) The Limited Warranty stated in part:

> The buyer's sole and exclusive remedy against Christie's and the consignor under this warranty shall be rescission of the sale and refund of the purchase price paid for the lot. . . . It is Christie's general policy, and Christie's shall have the right, to have the buyer obtain, at the buyer's expense, the opinion of two recognized experts in the field, mutually acceptable to Christie's and the buyer, before Christie's determines whether to rescind a sale under the above warranty. If the buyer requests, Christie's will provide the buyer with the names of experts acceptable to it.

The auction was held on May 26, 1999. The highest bidder, for a price of $750,000, was the Schwarz Gallery (the "Gallery"). Subsequent to the auction, the Gallery, allegedly based on negative reports circulating among members of the trade raising doubts about the attribution of the Painting to Wimar, refused to make payment and requested that Christie's rescind the sale. Christie's reaffirmed the attribution of the Painting to Wimar and demanded payment. In letters dated July 1 and July 11, 1999 Christie's wrote that it stood by the attribution, and that the negative hearsay the Gallery had reported did not constitute grounds for rescission. Reminding the Gallery that the transaction was subject to the Catalogue's Conditions of Sale, Christie's noted that it would consider rescinding the sale only if the Gallery followed those rules. The procedures required the buyer to obtain the written opinions of two mutually acceptable experts stating that the work was not that of Wimar.

The Gallery, however, continued to refuse to pay for the Painting, which remained in Christie's custody. At that point, Christie's again contacted Ketner by telephone in order to confirm his attribution of the Painting. According to Christie's account of the conversation, Ketner said that he was not then confident of the attribution, although he had been sure of it at the time he had written the Wimar book. When Christie's offered to arrange a viewing of the Painting in order for him to confirm his opinion, Ketner declined.[3]

The Mickles assert that shortly after the sale Ketner also spoke with Robert Schwarz, owner of the Gallery, and allegedly said that, having consulted more than 20 persons on the matter, he was "100% sure [the Painting] is a Wimar" and congratulated Schwarz for having "bought one of the most important Wimar to come on the market in recent years." (Pl.'s 56.1 Statement, at ¶ 9.) The Mickles contend that Christie's was aware of this statement

---

3. The Mickles point out that in its response to Interrogatories, Christie's characterization of the second telephone call to Ketner varied. Christie's there stated that: "Ketner stood by the attribution contained in his book, but noted that he had not seen the painting in ten years, declined to see the painting again, said he did not regard himself as a connoisseur, and did not want to offer his opinion about the authenticity of the Painting *for purposes of this dispute.*" (Pl.'s 56.1 Statement, at Item 11 (emphasis in original).)

by Ketner no less than one month before its rescission of the sale.

The Mickles then commenced an action in New York state court against the Gallery and Christie's in September 1999 (the "State Action") seeking to enforce the sale and obtain payment for the Painting. In January 2001, the Mickles stipulated to a dismissal of the State Action as to Christie's without prejudice to renew.

During the course of the state litigation, at the Gallery's request, Dr. William H. Truettner ("Truettner"), a senior curator at the National Museum of American Art, Smithsonian Institution, examined the Painting at Christie's offices. Truettner, who had played a role in an exhibit of Wimar works at the Amon Carter Museum in 1991, was acknowledged as an official consultant to Ketner's book. Truettner's viewing of the Painting, which occurred on May 5, 2000, was attended by attorneys or representatives for the Mickles, the Gallery and Christie's. According to Christie's, several weeks after his examination, Truettner, by telephone conference call with representatives and counsel for the Mickles, the Gallery and Christie's, expressed his opinion that the Painting was not the work of Wimar. Five months later, in November 2000, Christie's responded to interrogatories from the Gallery asking Christie's views concerning the attribution of the Painting and then asserted that "Christie's currently takes no position as to whether the Painting is by Carl Wimar." (Def.'s 56.1 Statement, at 5.).

Christie's states that in January 2001, representatives of Christie's and the Gallery met, at which occasion the Gallery again demanded that Christie's rescind the sale because there was no support for the Wimar attribution. According to Christie's, the Gallery then provided Christie's with copies of certain materials obtained in discovery in the State Action that the Gallery reportedly claimed demonstrated that the Mickles must have known, from their prior consultations with various museums and knowledgeable persons, that the Painting could not be attributed to Wimar. Christie's also contends that over a twenty-year period the Mickles and their agents, Frank and Julia D'Arista, had attempted to auction or privately sell the Painting and were unsuccessful allegedly because of problems with its attribution to Wimar. These disclosures allegedly included efforts on two occasions to consign the painting to the Sotheby's auction house and the unwillingness of the New Britain Museum of Art and the Gerald Peters Gallery to attribute the Painting to Wimar.

Christie's contends that the Mickles failed to fully reveal the Painting's prior history to Christie's, despite the warranty clause contained in the Consignment Agreement stating that the consignor "had no reason to believe that any lot of Property is not authentic or is counterfeit." (Consignment Agreement ¶ 5(a).) Christie's adds that a list of places where the Mickles claimed the Painting had been on loan for exhibition or research was inaccurate and misleading.

Following the January 19, 2001 meeting with the Gallery, and by reason of Christie's continued refusal to rescind the sale at that time, the Gallery requested that Christie's supply it with a list of acceptable experts to view the Painting and determine its authenticity, as provided for in the Catalogue's Limited Warranty and Conditions of Sale. Christie's asserts that it then compiled a list of experts it considered qualified to make such a determination, and sent the names to the Gallery and to the attorney for the Mickles in February 2001. By Christie's account, from that list, the Gallery selected Thomas Nygard ("Nygard"), owner of the Thomas Nygard Gal-

lery, to view the Painting. On April 6, 2001, in the presence of attorneys for the Mickles, the Gallery and Christie's, Nygard examined the Painting. By letter dated April 13, 2001, Nygard informed the parties of his opinion that the Painting was not by Wimar.

At that time, the Gallery renewed its demand that Christie's rescind the sale in accordance with the Catalogue's Conditions of Sale. Christie's maintains that, following its receipt of Nygard's letter, it concluded that it no longer held good faith grounds to sell the Painting as a Wimar. Based on its then having received the contrary views of two recognized authorities, Ketner's refusal to confirm his earlier opinion and the information regarding the Mickles' unsuccessful efforts to authenticate and sell the Painting as a Wimar, Christie's asserts it feared that it or the Mickles could have been subjected to liability unless Christie's rescinded the sale.

The Mickles challenge Christie's assertion in this regard. They point out that the Painting had been accepted for exhibition with an attribution to Wimar at several prominent Museums between 1982 and 1999 and was on display at Christie's galleries for no less than two months prior to the May 26, 1999 auction. Nonetheless, on May 1, 2001, Christie's informed the Mickles of its intention to cancel and rescind the sale. The letter stated that "Christie's may be subject to liability under the warranty it provides to [the Gallery] if the sale of [the Painting] were enforced." (Provost Aff.Ex. N.)

Mickle then, by order to show cause filed in this Court on May 10, 2001, sought a preliminary injunction and temporary restraining order to prevent Christie's from rescinding the sale. The Court denied Mickle's motion.

On May 11, 2001, Christie's cancelled and rescinded the sale of the Painting.

Christie's notes that the Gallery never paid for the Painting and that by reason of the rescission of the sale Christie's forfeited commissions to which it was entitled under the Consignment Agreement that would have totaled $122,500.

Christie's later answered the complaint in this action and filed counterclaims against the Mickles alleging fraud, misrepresentation, breach of contract and breach of warranty. It sought indemnity and declaratory relief with regard to its rescission. Plaintiff Diana J. Mickle filed her own counterclaim asserting essentially the same allegations contained in Mickle's complaint. The case was placed on the Court's suspense docket pending a determination of the State Action.

Following Christie's rescission of the sale, the Gallery moved for summary judgment in the State Action. It argued that in view of Christie's action and the withdrawal of its warranty of authenticity, the case should be dismissed. In response, the Mickles countered that the cancellation and rescission of the sale were invalid on the ground that Christie's lacked justification, and therefore the Gallery was not relieved of its obligation to pay for the Painting. The Mickles, reflecting the arguments they later raised in the case at hand, alleged that Christie's action was unwarranted because: (1) Christie's, under applicable agency law principles, owed the Mickles a fiduciary duty and did not act in good faith in rescinding the sale; (2) Christie's did not face any real risk of liability; and (3) the Gallery had not obtained the expert opinions in a timely fashion.

The State court granted the Gallery's motion and dismissed the action in a decision filed on November 5, 2001. *See Mickle v. Schwarz Gallery,* Index No. 604175/99 (Sup.Ct.N.Y.County, Nov. 5, 2001) (slip.

op.). In a determination bearing significantly on the instant matter, the State court rejected the Mickles' arguments that Christie's cancellation and rescission violated their rights and concluded that the Gallery was entitled to summary judgment relieving it of its obligation to pay because Christie's had rescinded the sale after the Gallery complied with the terms of the parties' agreements. *See id.* The Mickles did not appeal the state court's judgment, but reactivated their action in this Court.

### SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, a court may grant the motion only if, on the basis of the record of the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits filed, it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). The role of the court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The moving party bears the initial burden of establishing the basis for the motion and identifying those portions of the materials on the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 165 (2d Cir.2002). In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In weighing whether the movant has satisfied this threshold, the court must view the record as a whole in the light most favorable to the opponent of the motion. *See id.* at 255, 106 S.Ct. 2505. The movant may meet this initial burden by demonstrating the absence of evidence sufficient to support an essential element of the opponent's underlying claim. *See LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir.1998).

If the court finds that the moving party has satisfied his initial burden of persuasion, the opponent must then demonstrate the existence of a genuine issue of material fact. *See Goenaga v. March of Dimes*, 51 F.3d 14, 18 (2d Cir.1995). The opposing party must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To this end, the opponent "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Rather, he must support with specific evidence his assertion that a genuine dispute as to material fact does exist. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Goenaga*, 51 F.3d at 18.

The opposing party's showing of a genuine dispute must be grounded on concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### DISCUSSION

The Mickles' action before this Court is predicated on their claim that by cancel-

ling and rescinding the sale of the Painting, Christie's breached the Consignment Agreement, its fiduciary duties to the Mickles and its implied duties of good faith and fair dealing. The Court concludes that under the terms of the Consignment Agreement, Christie's was authorized to cancel and rescind the sale. Accordingly, the Mickles' claims fail as a matter of law. Christie's is thus entitled to judgment dismissing the Mickles' action and granting Christie's counterclaims for declaratory relief upholding its decision to rescind the sale of the Painting.

## A. *NON–PAYMENT*

■ It is undisputed that the Gallery never paid for the Painting. Under the express language of the Consignment Agreement, Christie's had no obligation to enforce payment by the buyer. Moreover, in the event the purchaser did not pay, the contract provided that Christie's, at its *"sole discretion"* as the Mickles' agent *"or on our own behalf"*, may cancel the sale and return the Painting to the Mickles. (Consignment Agreement ¶ 8(b) (emphasis added).) This clause unequivocally authorized Christie's to resort to the action it took in cancelling the sale on the ground of the Gallery's failure to pay.

The Mickles nonetheless argue that, as their agent, Christie's owed fiduciary duties to them under principles of agency law to act in furtherance of their interests and not to take sides against them; that Christie's should have more aggressively pursued payment by the Gallery; and that Christie's greater common law duties as the Mickles' agent override the rights it asserts pursuant to the Consignment Agreement. These arguments fail on several grounds.

First, under general principles of agency law, an auctioneer acts as the agent of the consignor. *See, e.g., Cristallina S.A. v.*

*Christie, Manson & Woods Int'l, Inc.,* 117 A.D.2d 284, 502 N.Y.S.2d 165, 171 (1st Dep't 1986). Indeed, in the Consignment Agreement, Christie's acknowledges its role as agent. (Consignment Agreement ¶¶ 8(b)–(c).) In this regard, the Mickles point to two basic tenets of agency law upon which they ground their claims. These rules prescribe that the agent has a duty to the principal to act solely for the benefit of the principal, and not to act on behalf of an adverse party without the principal's knowledge in all matters connected with the agency. *See* Restatement (Second) of Agency (hereinafter "Restatement") §§ 387, 391 (1958). Moreover, under some circumstances an agent may be required to act in a fiduciary capacity in carrying out the duties entrusted by the principal. *See Id.* § 13 ("An agent is a fiduciary with respect to matters within the scope of his agency.") The duty of undivided loyalty which the Mickles invoke derives from this standard. *See United States v. Miller,* 997 F.2d 1010, 1018 (2d Cir.1993).

It is also elementary agency law doctrine, however, that the legal duties of an agent may be defined and circumscribed by agreement between principal and agent. *See Greenwood v. Koven,* 880 F.Supp. 186, 194 (S.D.N.Y.1995); Restatement §§ 387, 391. In fact, the two provisions of the Restatement upon which the Mickles rely for the proposition that Christie's owed them overarching fiduciary duties are specifically preceded by the qualifying words "[u]nless otherwise agreed." Restatement §§ 387, 391. *See Greenwood,* 880 F.Supp. at 194. (noting that " '[t]he unless otherwise agreed' language appears throughout the Restatement, and it is clearly meant to allow parties to modify by contract the common law agency principles that would govern their relationship in the absence of an agreement."); *see also DeBruno v.*

*Sotheby Parke Bernet, Inc.*, No. 84–3021 (D.N.J. Nov. 6, 1984) (slip op.) (finding that, under a Consignment Agreement with a provision similar to that in Paragraph 8(b) at issue here, an auctioneer did not breach its consignment agreement with the seller by failing to enforce the seller's contract rights against a buyer who refused to make payment).

Moreover, any fiduciary duties an agent may possess rise to that higher standard only "as to matters within the scope of his agency." Restatement § 13. But, as discussed above, whatever matters comprise the scope of the agency, including those considered fiduciary, may be defined or modified by agreement between the principal and agent. *See Greenwood*, 880 F.Supp. at 194.

Here, the parties "otherwise agreed" in the Consignment Agreement to authorize Christie's to cancel the sale unconditionally, acting not only at its sole discretion but *on its own behalf.* Thus, any fiduciary obligations and duties of undivided loyalty Christie's may have owed the Mickles pursuant to the common law standards were modified by the parties' contract. The Consignment Agreement effectively contemplated transactions in which Christie's would be required to serve dual loyalties— to both buyer and seller of auctioned properties—and also authorized Christie's under the stated conditions to protect its interests before those of the consignor. Such circumstances are permissible insofar as unambiguously agreed to by the parties. *See id.*

The Consignment Agreement contains no limitations defining circumstances that constitute non-payment or that demand that the buyer provide reasons justifying non-payment, thus leaving the matter entirely within Christie's discretion, subject only to the parties' implied duty, discussed below, to exercise their rights in good faith. Because it is undisputed that the Gallery refused to pay for the Painting, and that under the terms of the Consignment Agreement Christie's had no obligation to enforce the sale or pursue the buyer for payment under any circumstances, Christie's was unconditionally authorized to cancel the sale on its own behalf in the event of non-payment. The Court thus concludes that there is no genuine issue of material fact warranting a trial on the Mickles' claims. Accordingly, Christie's is entitled to entry of summary judgment on this ground.

## B. *POTENTIAL LIABILITY*

Paragraph 8(c) of the Consignment Agreement provided Christie's another basis to cancel the sale of the Painting and rescind the contract. The provision permitted Christie's to rescind if:

- at any time Christie's in our sole judgment determines that the offering for sale of any Property has subjected or may subject Christie's and/or Consignor to any liability, including liability under warranty of authenticity of title.

The Court finds that Christie's rescission of the sale of the Painting was a valid exercise of Christie's discretion and rights under this termination clause. Several aspects of the provision compel this conclusion. First, the Consignment Agreement broadly gives Christie's the right to make the determination "at any time" and in its "sole judgment." Second, the language of this provision reflects a temporal dimension that looks to present and past events as well as to prospective possibilities. It extends not only to matters that actually have occurred but to potential liability that "may" arise from Christie's offering of a property for sale. Third, the concern over liability may relate to that to which either Christie's "and/or" its consignor has been or may be subjected. Finally, the right

applies to Christie's determination as regards a perceived concern over "any liability," specifically including liability under the warranty of authenticity of title—the very issue here in contention. A finding that Christie's properly invoked the right this provision conferred is based on an application of a subjective standard as controlling Christie's discretion to rescind, guided by a duty to exercise good faith in so doing.

### 1. Subjective Standard

■ The Consignment Agreement does not articulate the applicable standard or any objective measures by which to guide or confine Christie's exercise of its right to rescind pursuant to Paragraph 8(c). Addressing this void, the Mickles contend that such unlimited authority renders this provision either unenforceable or necessarily subject to an objective standard of reasonableness. That argument is wrong as a matter of law.

Agreements conferring upon one party an indefinite right to condition performance upon a determination that is based on an act of personal discernment or sole discretion are uniformly upheld—subject to a duty on the part of the party so empowered to exercise honest judgment—if the contract as a whole unambiguously expresses the parties' intent to grant such unilateral, subjective authority consistent with their justified expectations and the subject matter and common purpose of their bargain. See Kohler, 80 F.3d at 1185–86 (finding a "sole discretion" provision as used in auctioneers' consignment agreements to be analogous to a "satisfaction clause" and that in such contracts "a party's exercise of judgment or discretion is a condition for its duty to perform.") (citing Greenwood, 880 F.Supp. at 186); Fursmidt v. Hotel Abbey Hldg. Corp., 10 A.D.2d 447, 200 N.Y.S.2d 256, 259 (1st Dep't 1960); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.4 n. 35 (1st ed.1990) (hereinafter "Farnsworth") ("Words such as personal or entire satisfaction and sole judgment help to show that honest satisfaction was intended.") (emphasis in original); 13 Richard A. Lord, Williston on Contracts § 38:21, at 459–60 (4th ed.2000) (hereinafter "Williston") ("Since ... such a promise is generally considered as requiring a performance which must be satisfactory to him or her in the exercise of honest judgment, such contracts have been almost universally upheld."); see also Restatement (Second) of Contracts § 228, comment a ("If the agreement leaves no doubt that it is only honest satisfaction that is meant and no more, it will be so interpreted, and the condition does not occur if the obligor is honestly, even though unreasonably, dissatisfied.").

Applying these principles here, the Consignment Agreement manifests clearly the parties' understanding to invest Christie's with the "sole discretion" to rescind upon Christie's determination that it has been or might be subjected to liability on account of a sale. Thus, to warrant exercise of its open-ended right pursuant to Paragraph 8(c), Christie's needs only to demonstrate that it possessed a subjective fear of potential liability. See Kohler, 80 F.3d at 1187 (noting that the "use of the phrase 'sole discretion' ... denotes subjectivity."); Greenwood, 880 F.Supp. at 186. See also Williston § 38:23, at 481 ("The party to be satisfied is the sole judge of his or her satisfaction, and a subjective standard of honest satisfaction is applicable. If the party to be satisfied asserts in good faith that he or she is not satisfied there can be no inquiry into the reasonableness of his or her attitude."). This authority is consistent with the parties' expressed intent and fair expectations, and does not conflict with Christie's limited warranty obli-

gations. *See Rothenberg v. Lincoln Farm Camp. Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves part unreasonable or of no effect.").

Read as a whole, the parties' agreements here convey a purpose that, where appropriate, Christie's rescission of a sale would operate to protect Christie's business reputation from the effects of its purveying fake art. That Christie's may exercise the discretion exclusively "at any time" and at the cost of forfeiting its commissions plainly evinces that this provision overrides Christie's warranty obligations, as long as Christie's demonstrates that it possessed an honest, but also subjective, belief that it might be exposed to liability. Moreover, as auctioneer, Christie's is legally bound, by contract and by law, to multiple duties owed to different parties. It is obligated to the buyer and generally to the public to sell genuine goods fairly reflecting Christie's commercial representations. It also must loyally execute transactions so as to promote the seller's (and Christie's) interest in consummating the sale at the highest possible price. In this connection, the broad rescission provision permits Christie's to safeguard against liability not only to itself, but to the seller in situations where, such as occurred here, substantial doubts are raised by the buyer and others about the authenticity of an item already sold. To this extent, Christie's sole assessment of the risk of liability, and its ability to act swiftly to undo a challenged sale, potentially benefit both Christie's and its consignor, and thus the discretion to rescind is consistent with the parties' mutuality of interests. *See Kohler*, 80 F.3d at 1187; *Greenwood*, 880 F.Supp. at 204.

*Greenwood* involved facts analogous to those present in the instant matter and the application of a contract provision identical to Paragraph 8(c) of the Consignment Agreement. *See Greenwood*, 880 F.Supp. at 192. In *Greenwood*, following Christie's auction sale of a work of art, the buyer raised questions about its authenticity. As it did in the case at bar, Christie's at first stood by its warranty of the authenticity of the work. When the purchaser remained unsatisfied, Christie's sought the opinion of an independent authority. The designated expert declined to issue such authentication. Christie's then rescinded the sale and returned the proceeds to the buyer.

The seller argued that despite the express provisions of its consignment agreement with the seller and limited warranty of provenance to the buyer, Christie's had a duty as the seller's agent to refrain from actions adverse to the seller's interests, such as seeking an independent expert's opinion after consummation of the sale. The seller thus claimed, as the Mickles assert here, that Christie's had breached the consignment agreement and Christie's fiduciary duty of undivided loyalty to the seller.

In rejecting the seller's arguments, and granting summary judgment to Christie's, the *Greenwood* court concluded that because, pursuant to the terms of the consignment agreement, the only judgment relevant to the determination regarding fear of potential liability was that of Christie's, an exercise of that right and discretion to rescind would be measured by a subjective standard. *See Greenwood*, 880 F.Supp. at 199; *see also Kohler*, 80 F.3d at 1187 (holding that subjective belief was the applicable standard where a consignment agreement authorized auctioneer to rescind a sale when it determined, at its "sole discretion," that it or its consignor was subject to liability); *Fursmidt*, 200

N.Y.S.2d at 259 (holding that the standard of satisfaction was subjective, where one party was to be "sole judge" of whether a condition had been satisfied and the determination involved the exercise of judgment).

The Court finds that under the circumstances prevailing here, a sufficient basis existed for Christie's to hold an honest belief that it might be subjected to liability if it did not rescind the sale. Indeed, in some respects, the facts in the instant case are even more compelling than those in *Greenwood*. Here, unlike the events in *Greenwood*, Christie's did not itself voluntarily undertake to obtain the post-sale independent expert review of the authenticity of the Painting. Instead, it followed the procedure explicitly authorized by the Catalogue's Conditions of Sale and Limited Warranty, to which the consignment and sale were subject, that called for the buyer to supply the opinions of two recognized experts as a precondition for Christie's to consider rescission.

There can be no genuine dispute that Christie's conduct did not breach a duty of loyalty to the Mickles through its role in this process, even if the resulting rescission may conflict with the seller's interest in upholding the transaction and obtaining payment, when in fact the procedure Christie's followed comported precisely with the duties the parties defined expressly in the terms of their agreements. In any event, the outcome of the authentication procedure was by no means predetermined. It was entirely conceivable that one or more of the independent experts could just as well have sustained the Painting's attribution to Wimar, thereby providing Christie's with additional and warranted grounds, in furtherance of the Mickles' interests, to refuse to rescind the sale.

Moreover, at the time it rescinded the transaction, Christie's faced not just potential but actual litigation. By then, the Mickles had commenced the State Action, charging Christie's with fraud, breach of contract, breach of fiduciary duty and breach of the duty of good faith and fair dealing. It is difficult to conceive of more compelling grounds for Christie's to harbor honest concern over liability than the reality of a pending lawsuit in which it had been subjected, by both buyer and seller, to accusations of misconduct. That litigation brought together facts already known and additional information of which Christie's asserts it was unaware that further extended doubts about the genuineness of the Painting and that could have served as grounds to invoke Christie's obligations under the warranty and to challenge the degree of care and skill Christie's exercised in making its representations about the attribution of the Painting. In light of this record, the Mickles' charge that Christie's belief in the potential for liability was baseless ignores that it was they themselves who, by instituting the litigation in the first place, largely contributed to creating the basis for Christie's honest concern.

Given the opinions that two independent experts already had expressed denying the authenticity of the Painting, and Ketner's statements that he had not seen the Painting in ten years and his refusal to view it again to reaffirm his earlier attribution in light of the underlying dispute—a reluctance which Christie's honestly could have construed as creating some weakening in the foundation for its own attribution of the Painting—Christie's could have entertained a good faith belief that it might be subjected to liability had it not rescinded the sale. Under the Consignment Agreement, Christie's had disclaimed any obligation to enforce payment by the buyer and "at any time" in its "sole discretion" could rescind a transaction that may sub-

ject it to liability. It would defy reason and common sense to hold that Christie's would be compelled to enforce, without concern for its potential exposure, the sale of a work whose authenticity, in accordance with the parties' own agreed procedure, had been seriously questioned and which Christie's could no longer reasonably warrant.

In fact, Christie's already stood between potential liability to both the Mickles and the Gallery, given Christie's representations of authenticity and legal duties running to both. The negative opinions or doubts conveyed by the experts Christie's had recognized, the Gallery's stated view that Christie's had breached its warranty, Christie's awareness, from disclosures to it by the Gallery, concerning the prior difficulties the Mickles had encountered trying to authenticate the provenance of the Painting and sell it as a work of Wimar, all supplied further grounds that, alone or in combination, could have supported an honest belief on Christie's part that its more prudent course, the path presenting the lesser risk of potential liability, was to rescind of the sale.

The Consignment Agreement anticipated and endeavored to safeguard Christie's under these very circumstances by providing that in the event of non-payment by the buyer, Christie's "at any time" and "on [its] own behalf" may rescind the sale, and additionally that Christie's right to rescind based on fear of actual or potential liability was to be exercised "in Christie's sole judgment." (Consignment Agreement ¶¶ 8(b), 8(c).)

### 2. *Covenant of Good faith*

█ Christie's exercise of its "sole discretion" to rescind a sale pursuant to Paragraph 8(c) of the Consignment Agreement based upon a subjective concern over potential liability is not wholly unfettered,

placing the consignor entirely at the auctioneer's mercy. Rather, the subjective standard is circumscribed by an implied covenant of good faith and fair dealing. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."); *Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989) ("[C]ontracting parties' fields of discretion under a contract are bounded by the parties' mutual obligation to act in good faith."); *Greenwood,* 880 F.Supp. at 199; *see also Fasolino Foods Co., v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992) ("Under New York Law, parties to express contract are bound by implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."); *Filner v. Shapiro,* 633 F.2d 139, 142 (2d Cir.1980).

In this regard, Christie's subjective determination may be upheld if it sufficiently satisfied some of the legally recognized measures of good faith and fair dealing, for instance if its exercise of discretion: (1) represented an informed choice; (2) was based on an honest belief; (3) was preceded by due diligence against a backdrop of a real rather than a fancied prospect of liability; (4) was impelled and constrained by authority deriving from the agreements or other rules governing the relationship between the parties; (5) was taken for the stated reason as opposed to some other pretextual purpose; (6) was consistent with a motive to effectuate the parties' express common purpose and reasonable expectations rather than to frustrate the contract; (7) caused it to forego a benefit or lose an opportunity it bargained for and reasonably anticipated from the consummation of the agreement. *See, e.g., Cross*

& Cross, 886 F.2d at 502; Greenwood, 880 F.Supp. at 199; see also Restatement (Second) of Contracts § 205, comment a (1981) (a good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"); Farnsworth § 8.4; Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv.L.Rev. 369, 372–73 (1980).

It is true that many of these issues, which fundamentally implicate judgments about personal good faith, belief, motive and intent, generally entail fact-intensive inquiries more appropriately resolved at a trial on merits than by summary disposition. See Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The difficulties inherent in proving such states of mind, ordinarily turning as they do on questions of credibility, demand that all reasonable inferences be drawn in favor of the party opposing summary judgment. See id.

That is not to say, however, that every accusation of bad faith is necessarily grounded in fact. It is easy to charge dishonesty and bad faith; it is harder to prove it. Occasions do arise when a purported legal claim is empty from the start, and is lightly tossed into the wind on the strength of nothing more than a hope and a prayer that some providential breeze may blow it where intended and somehow make it stick. A party so maligned should not be compelled to bear the attendant humiliation compounded by expense, the harms enlarged by the burdens of having to endure a trial in order to defend against and refute the bare or fanciful allegation.

Our justice system has devised adjustments to mitigate the potential injustices to which this prospect gives rise. The summary judgment device, imperfect and cumbersome for this purpose though it may be, offers one such modest recourse. The procedure is warranted precisely where the action presents no specific evidence demonstrating a genuine dispute regarding bad faith, and where, on the facts presented, a reasonable jury would not have sufficient grounds to infer bad faith and unfair dealing, the record thereby compelling a verdict for the movant. See Anderson, 477 U.S. at 248, 106 S.Ct. 2505; Matsushita, 475 U.S. at 587, 106 S.Ct. 1348; Greenwood, 880 F.Supp. at 202.

Here, to counter Christie's motion, the Mickles have offered little more than the allegations and denials in their pleadings augmented by conclusory arguments and unsubstantiated speculation. This response is insufficient. See Anderson, 477 U.S. at 256, 106 S.Ct. 2505; Scotto, 143 F.3d at 114. The sparse factual material the Mickles proffer in their efforts to create a triable dispute concentrates on the extent of Christie's knowledge of other authorities who had attributed the Painting to Wimar; the museums and galleries which had exhibited the work as a Wimar; and Christie's own representations in this regard. Such evidence is not relevant here. For, the proper inquiry before the Court is not whether or not the Painting was truly executed by Wimar, nor the degree to which Christie's reasonably believed and warranted that it was. Rather, the pertinent question addresses whether, at the time it rescinded, Christie's entertained an honest belief in potential liability arising from the sale, and the adequacy of Christie's grounds to claim it acted in good faith.

By the applicable subjective measure, it would not matter how much evidence Christie's possessed tending to confirm the Painting's authenticity or how long Christie's maintained that view. It is entirely possible for Christie's, relying on the information before it, to stand by its attribution

and yet, on the basis of countervailing reliable opinions, to hold an honest view concerning the prospect of liability in the event it failed to abide by its obligations to the buyer pursuant to the Conditions of Sale. *See Greenwood,* 880 F.Supp. at 203. Because the parties plainly agreed to this procedure and Christie's honored it in good faith, there can be no genuine issue in dispute concerning Christie's right to rescind even if it continued to adhere to its conviction of the originality of the artwork.

Beyond their inapposite submissions and related arguments, the Mickles have produced no concrete evidence that, viewed in the light most favorable to them, would permit a rational trier of fact reasonably to infer bad faith on Christie's part in rescinding the sale—in other words, that Christie's rescinded without warrant and for some other reason than that which it stated, and that its action was not grounded on demonstrably genuine concern over potential liability to the Gallery and/or to the Mickles. By way of assertions of bad faith, the Mickles muster nothing more than mere conjecture that Christie's rescission was motivated by a desire to maintain valuable commercial relations with a wealthy, important client. Similar bare and conclusory assertions were found insufficient in *Greenwood* to defeat the auctioneer's motion for summary judgment under analogous circumstances. *See Greenwood,* 880 F.Supp. at 202.

For its part, Christie's has offered undisputed evidence that, objectively considered, compellingly demonstrates that in rescinding the sale it acted in good faith, motivated by honest belief that had it not done so it could have been subjected to liability. Rather than outright cancelling the sale promptly when the Gallery expressed doubts about the authenticity of the Painting, Christie's initially stood by its attribution and demanded payment.

Soon after the Gallery voiced its concerns, Christie's, in an effort to uphold the transaction and thereby further the interests of both the seller and itself, endeavored to obtain Ketner's reaffirmation of his published attribution. At this point Ketner declined to view the Painting again under circumstances that could have given rise to a good faith impression that he may have hedged on his prior opinion. Moreover, by foregoing its substantial commission if it rescinded the sale, Christie's stood to lose a primary benefit of the agreement for which it had bargained.

Further sustaining the transaction while maintaining its position within contractually authorized process, Christie's invoked the Limited Warranty and Conditions of Sale. That agreement permitted Christie's, as the basis for determining whether to rescind the sale, to request the Gallery to provide the opinions of recognized experts concerning the Painting's attribution. In accordance with that procedure, two mutually acceptable authorities, Truettner and Nygard, rendered negative views regarding the authenticity of the Painting. Christie's, however, did not rescind after receiving Truettner's negative report in May 2000. As a further check on the exercise of its discretion, and consistent with the established procedure, Christie's rescinded the sale only after receiving the second expert opinion in April 2001, nearly two years after the auction, thereby forfeiting a $122,500 commission. Significantly, this process was not hidden from the Mickles. Rather, they or their attorney attended the experts' viewings of the Painting, and were contemporaneously informed about the resulting adverse opinions.

These circumstances are comparable to what other courts have found sufficient to satisfy the subjective standard and to warrant a ruling, in granting motion for sum-

mary judgment, that no breach of the duty of good faith and fair dealing had occurred. *See, e.g., Kohler,* 80 F.3d at 1187; *Greenwood,* 880 F.Supp. at 201; *see also Weight Watchers of Quebec Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1053 (E.D.N.Y.1975) (holding that subjective good faith of the franchisor was the proper test and was satisfied where the determination involved the advisability of instituting legal proceedings in a foreign country). The facts persuasively demonstrate that Christie's did not act arbitrarily, without warrant or agreed procedure, solely for its own account and with nothing at risk. Examining the record from a perspective looking to past, present and prospective events, the Court finds no evidence that Christie's sought to capture a benefit not contemplated or an opportunity held and foregone at the time of contract formation. Nor does the record establish that in the performance of its discretionary right to rescind, Christie's arbitrarily sought to deprive the Mickles of a reasonable expectation for which they had bargained. In short, the Mickles point to no evidence they have introduced or uncovered on the record here that compellingly manifests the "subterfuges and evasions ... of the spirit of the bargain" that characterize the commonly recognized hallmarks of bad faith, such as imperfect performance, improper motive, self-dealing, duplicity, fabrication, artifice, unlawfulness; transparent pretext; or deliberate frustration of an agreement. Restatement (Second) of Contracts § 205, comment d.

Rather, Christie's followed a measured, orderly course which, even if somewhat drawn out, was guided by contractual procedures and limited by constraints that reckoned the interests not only of Christie's, but of the Gallery and the Mickles. Viewed in the light of the subject matter and overall object of the contract, this performance, even if ultimately nullifying

the transaction in which both Christie's and the Mickles had an interest, in fact represented a satisfaction rather than a frustration of the parties' agreement. Christie's decision to rescind was faithful to a common purpose, also clearly contemplated in the Consignment Agreement, of averting potential liability to the buyer that may have exceeded the value of the bargain—an end that also was to benefit both parties and was consistent with the Mickles' justified expectations.

As devoutly as they may have wished a consummation of the sale, the Mickles' expectations would not be justified insofar as grounded on insistence that Christie's, at the risk of substantial liability and foregoing a protection the contract unequivocally accorded, enforce the sale of an artwork whose authenticity had been seriously questioned. Such an outcome, from a fair reading of the Consignment Agreement, is not one for which Christie's bargained and would deprive Christie's of the benefits and reasonable expectations of the contract. *See Rexnord Hldgs., Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994) ("Implied covenant of good faith and fair dealing.... precludes each party from engaging in conduct that will deprive the other party of the benefit of their agreement.").

On the record before it, the Court finds no genuine issue of fact in dispute concerning Christie's good faith, and concludes that no reasonable trier of fact would render a verdict determining that Christie's actions constituted bad faith and unfair dealing.

### C. *ADVISE OF COUNSEL*

■ The Mickles also contest the bona fides of Christie's fear of liability defense to the extent they allege Christie's concern did not arise from advise of counsel. By

their theory, any lesser justification represents merely general aversion to litigation and demands discovery to confirm what Christie's actually was advised by counsel. The Court finds no merit in this argument. Putting aside the attorney-client privilege obstacle which the Mickles superficially dismiss, there is no indication on this record that in deciding to rescind the sale Christie's manifested simply an unsubstantiated general anxiety about litigation which it hid behind an invocation of advise of counsel. The discussion above marshals the sufficient evidence Christie's produced supporting the basis for Christie's honest belief in the potential liability to which it was subject if it failed to rescind. It suffices to dispose of the Mickles' contrary argument.

### D. *UNCONSCIONABILITY*

■ As their final bid to defeat summary judgment, the Mickles invoke the doctrine of unconscionability as applied to the construction of the Consignment Agreement propounded by Christie's. They assert procedural unfairness in the unequal bargaining power between the parties that precluded extensive negotiations over the terms of their agreements; the small print in which the standard form auction contract containing the termination clause was written; and their reliance on Christie's expertise and firm initial assurances of the Painting's authenticity, coupled at the same time with the implications of the termination provisions of the contract. The Mickles also challenge as unlawful the "substantive unfairness" they perceive in the Consignment Agreement's rescission clauses insofar as these provisions countenance the "utter surrender of a consignor's rights to the arbitrary determinations of an auction house...." (Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment, dated April 2002, at 21.)

The Court finds these contentions unavailing. There is no merit in the argument that the Consignment Agreement was unconscionable as a matter of law by reason of the disparity in bargaining power between the parties, or of the standard form of their contract or its substantive terms. In New York, the threshold governing application of the unconscionability doctrine is necessarily rigorous. It requires conduct "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Sablosky v. Edward S. Gordon Co.,* 73 N.Y.2d 133, 538 N.Y.S.2d 513, 535 N.E.2d 643, 647 (1989). *Mienko v. Crafco Inc.,* No. 92 Civ. 1490(LMM), 1996 WL 219651, *2 (S.D.N.Y. May 1, 1996) ("[M]ere inequality in bargaining power does not render a contract unenforceable.") (citing *Finkle and Ross v. A.G. Becker Paribas, Inc.,* 622 F.Supp. 1505, 1511 (S.D.N.Y. 1985)). Nothing on the record before this Court remotely approaches this test.

The provisions of Christie's standard agreement that the Mickles challenge have been upheld and enforced by other courts. *See, e.g., Greenwood,* 880 F.Supp. at 186; *see also Kohler,* 80 F.3d at 1185; *DeBruno,* No. 84–3021 (slip op.), at 3. Moreover, the commercial inequality the Mickles deplore is a reality in a vast majority of contractual relationships. Instances in which the contract parties' market force is evenly balanced and the opportunities for them to engage in perfectly equipoised give and take are the exception rather than the rule. Were disproportionate negotiating strength by itself to serve as ground to invalidate business transactions, every form of commerce through the country, and even beyond, would be immediately threatened or paralyzed. *See generally Sablosky,* 538 N.Y.S.2d 513, 535 N.E.2d at 647; *Mienko,* 1996 WL 219651, at *2.

The fact is that, art novices or not, the Mickles entered into the Consignment Agreement, as most people routinely do in the course of ordinary commercial affairs, with their eyes open. As much as they invoke their rank as hapless amateurs victimized by the powerful auction house, their protestations ring somewhat hollow in the context of the revelations, undisputed by them, that during the course of almost twenty years they had repeatedly endeavored to sell the Painting, privately and at public auctions, in the process undoubtedly transacting business with numerous art dealers, experts, agents, attorneys, museums, galleries and other auctioneers. It belies common experience, and strains the bounds of reasonable inference, to suggest that in entering into the Consignment Agreement with Christie's, the Mickles were entirely untutored, did not read or understand the contract they signed, and lacked the means, opportunities and resources to become adequately informed of their rights and remedies.

The Mickles' substantive argument fares no better. It rests on the premise that Christie's right to rescind the sale permitted Christie's to make "arbitrary determinations at its discretion." This theory was already addressed above. First, whatever its scope, the discretion Christie's possessed could be exercised only because the Mickles so consented under the Consignment Agreement they executed. More significantly, however, the claim fails because it is grounded on a fallacy: the theory of "unbridled discretion" that the Court rejected above in determining that the exercise of Christie's rescission rights was constrained by an implied duty of good faith and fair dealing—an obligation the Court found was fulfilled in this case. As the *Greenwood* court noted in dismissing a similar argument challenging an identical contractual provision as unjust:

Christie's contractual arrangements between its buyers and its sellers appear to be a sensible resolution to a complex commercial problem, recognizing important duties to different parties. The buyer of artwork is protected by a warranty; the seller is protected not only by the covenant of good faith, but by the fact that an auction house earns its money by consummating final sales of artwork. Thus, the broad discretion to rescind afforded Christie's by the Consignment Agreement is tempered by the fact that Christie's own interest is that such rescission not occur.

880 F.Supp. at 203.

The Court, finding that the Mickles have advanced no other basis sufficient to defeat Christie's motion, concludes that Christie's is entitled to the relief it seeks here.

### E. *COLLATERAL ESTOPPEL*

■ The Court also finds that Christie's is entitled to summary judgment by operation of the doctrine of collateral estoppel, or issue preclusion. This principle "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 365 (2d Cir.1992); *see also Harris v. Dep't of Health,* 202 F.Supp.2d 143, 160 (S.D.N.Y. Apr.24, 2002); *Halyalkar v. Bd. of Regents,* 72 N.Y.2d 261, 532 N.Y.S.2d 85, 527 N.E.2d 1222, 1224 (1988).

In the Mickles' State Action, the validity of Christie's rescinding the sale was a central issue actually litigated and adjudicated against the Mickles. In support of its motion for summary judgment, the Gallery

argued that Christie's sale of the Painting to the Gallery was invalidated by reason Christie's rescission of the transaction and that Christie's had breached its warranty, consequently rendering the contract of sale unenforceable and relieving the Gallery of its obligation to pay.

In response, the Mickles maintained that Christie's had no legal right or justification to rescind, interposing the same arguments raised in connection with the matter before this Court: the Mickles' rights as third party beneficiaries under the Consignment Agreement; Christie's fiduciary duties as their agent; the absence of any real risk of liability to Christie's from enforcing the sale; and the Gallery's untimely production of expert opinions. The State court's decision acknowledged the Mickles' contentions and found no merit in them. *See Mickle,* Index No. 604175/99, at 4.

The State court granted the Gallery's motion for summary judgment on the ground that, because Christie's had rescinded the contract of sale, there was no remaining material issue to be tried concerning the Gallery's obligation to pay. *See id.* The court's factual recitation, a predicate for its holding, noted that the Gallery had complied with Christie's rescission policy set forth in the Conditions of Sale by obtaining the opinions of two experts concerning the authenticity of the Painting. *See id.* at 2.

The State court's judgment necessarily incorporated an adjudication on the merits of the issue concerning the validity of the rescission by Christie's. Noting that, under the Consignment Agreement, the Mickles authorized Christie's to rescind at any time when Christie's determined, in its sole judgment, that it might be subject to liability as a result of the sale, the court concluded that the Mickles' institution of the State Action "was not a bar to Christ-

ie's rescission of the sale", and that consequently "the Gallery has no responsibility to fulfill the original contract terms and pay for the painting." *Id.* Absent the premise that the rescission of the sale was a valid exercise of Christie's discretion under the terms of the Consignment Agreement, the State court's ruling relieving the Gallery of an obligation to pay for the Painting would have been unwarranted.

The doctrine of collateral estoppel bars the Mickles from relitigating in this court the issue of the validity of Christie's rescission of the sale of the Painting. Each of the Mickles' three causes of action—breach of contract, breach of fiduciary duty and breach of implied duties of good faith and fair dealing—fundamentally depends on a claim that Christie's rescission of the sale was invalid or unjustified under the terms of the identical contractual provisions and on the very same facts and actions allegedly constituting wrongful conduct that were at issue in the State Action. An adjudication of these matters adverse to the Mickles was embodied in the state court's judgment. The Mickles, contrary to their denials, had a full and fair opportunity to litigate the rescission issue in the State Action. They also chose not to appeal the ruling. This Court thus concludes that the same issue cannot be relitigated in this action, and that the Mickles' claims here must be dismissed.

### ORDER

For the reasons discussed above, it is hereby

**ORDERED** that defendant Christie's, Inc.'s motion for summary judgment is granted; and it is further

**ORDERED** that plaintiffs Mickles' complaint and third-party defendant's counterclaims are dismissed with costs and without leave to amend; and it is finally

**ORDERED** that the Clerk of Court enter judgment for Christie's on its counterclaims declaring that Christie's was entitled to cancel and rescind the sale of the Painting at issue here.

**SO ORDERED.**